Larry D. COMPTON, Trustee in Bankruptcy for Danilo and Angelita Nelvis, Appellant,

v.

Nicholas KITTLESON, Appellee.

No. S–12175.

Supreme Court of Alaska.

Nov. 9, 2007.

Mark A. Sandberg, Sandberg, Wuestenfeld & Corey, Anchorage, for Appellant.

Brewster H. Jamieson and Andrea E. Girolamo–Welp, Lane Powell LLC, Anchorage, for Appellee.

Before: MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Attorney Nicholas Kittleson filed a consumer protection action against an Anchorage used car dealership on behalf of Danilo and Angelita Nelvis. Kittleson represented the Nelvises under a "hybrid" fee agreement that called for Kittleson to receive a contingent fee unless the Nelvises settled the case "for an amount that will pay less than $175.00 per hour for the time [Kittleson] invest[ed]" in the case; in that event, the Nelvises would be required to pay Kittleson a fee based on the $175 hourly rate. Before trial the Nelvises turned down a $25,000 settlement offer. They lost at trial, and the superior court entered a judgment ordering them to pay costs and attorney's fees totaling almost $100,000. The Nelvises then petitioned for bankruptcy, and the bankruptcy trustee sued Kittleson to recover their losses, alleging that Kittleson committed legal malpractice because his fee agreement violated the Alaska Rules of Professional Conduct. The sole question raised in this appeal is whether the type of hybrid-fee agreement at issue here is barred as a matter of law. We hold that Alaska law prohibits a fee agreement that uses a client's decision to settle as a trigger to convert contingent-fee representation into an obligation to pay hourly fees because a hybrid agreement of this kind impermissibly burdens the client's exclusive right to settle a case.

## II. FACTS AND PROCEEDINGS

In October 1999 Danilo and Angelita Nelvis bought a used SUV in Anchorage from Cream Puff Auto, Inc. The SUV soon developed serious engine problems and, by December 1999, had stopped running completely. Dissatisfied with Cream Puff's response to their complaints, the couple sought help from Kittleson, contending that Cream Puff had misrepresented the condition of the SUV

and had failed to honor their extended care warranty.

After an initial consultation, Kittleson sent the Nelvises a proposed fee agreement along with a letter estimating that their case had a seventy percent chance of success. Kittleson noted that if they won, the Alaska Consumer Protection Act could entitle them to recover treble damages. Kittleson also advised that if they lost, they would be responsible for a percentage of Cream Puff's attorney's fees and costs; he pointed out that the potential cost could "reach $10,000 or more." The letter then told the Nelvises that Kittleson "would be honored to fight for your rights in obtaining a fair settlement/judgment in this case," that he was attaching a proposed fee agreement, and that the Nelvises could begin the process of bringing a lawsuit by executing the agreement and fulfilling its conditions.

The fee agreement attached to Kittleson's letter proposed a hybrid arrangement that would start with a contingent-fee arrangement entitling Kittleson to thirty-three percent "of any amounts recovered from all defendants plus any award of attorney fees"; under the contingent-fee arrangement, the agreement explained, "[i]f there is no recovery for you, there will be no fee." But the agreement would automatically convert to hourly-fee representation at the rate of $175 per hour if the Nelvises "decide[d] to drop the case." Specifically, while noting that the Nelvises retained "final discretion to settle this case," the agreement provided: "If you agree to settle this case for an amount that will pay less than $175.00 per hour for the time I invest, then I shall receive an amount over and above the 33% to compensate me at the rate of $175.00 per hour before you receive your portion of the settlement." The basis of Kittleson's compensation thus hinged on whether the Nelvises agreed to settle, the amount of the agreed settlement, and the number of hours Kittleson had invested in the case at the time the case settled.

The Nelvises signed the proposed agreement, establishing an attorney-client relationship with Kittleson. Kittleson then filed a complaint against Cream Puff in the superior court in Anchorage. The complaint alleged that Cream Puff had committed fraud and breach of warranty, and had violated the Consumer Protection Act and various Federal Trade Commission regulations.

While the Nelvises' case was pending in the superior court, a similar hybrid-fee agreement that Kittleson had used in an unrelated consumer protection case came under scrutiny by a federal judge in an Anchorage bankruptcy case.[1] Prompted by questions raised in the bankruptcy matter, Kittleson wrote to the Alaska Bar Association, requesting an informal ethics opinion on his use of the hybrid-fee agreement. Bar counsel issued an informal opinion concluding that the fee agreement raised several ethical concerns, including the agreement's "potential to significantly inhibit the client's exercise of his or her right to settle a matter." Bar counsel also stated that he believed that a fee arbitration panel adjudicating a fee dispute under the fee agreement "would find impermissible pressure on the client's right to settle or not settle a matter and would reduce the fee to thirty-three percent and might possibly refer the matter for investigation."

Less than a week after the bar issued its ethics opinion, Cream Puff sent Kittleson an offer of judgment for $25,000, including costs and attorney's fees. In a letter informing the Nelvises of Cream Puff's offer, Kittleson disclosed that, when calculated at the rate of $175 per hour, his hourly fees for time worked on the case to date already exceeded $30,000; thus, Kittleson observed, "acceptance of this offer would mean no recovery

---

1. In response to questions raised by the judge and the opposing counsel in the bankruptcy matter, Kittleson explained that he had added the fee-conversion provision to his standard contingent-fee agreement after a client in an earlier consumer protection case had decided to settle before trial, thus preventing Kittleson from recovering a statutory award of attorney's fees under the Consumer Protection Act. While the settlement left his client satisfied, Kittleson noted, the contingent-fee share of the recovery yielded just $2,500 for a case in which Kittleson had invested roughly $16,000 worth of his time. The bankruptcy judge authorized the trustee in bankruptcy to enter into the fee agreement with Kittleson, noting that actual fees would have to be approved by the court at the time of any settlement.

for you, as it would be less than the amount already incurred for my actual attorney fees." Kittleson nonetheless offered to "compromise my fee arrangement to the amount of $22,000.00," pointing out that "[t]his would then mean that you would receive a total of $3,000." Kittleson also attached a copy of the bar association's ethics opinion and advised the Nelvises they could accept Cream Puff's offer and pursue fee arbitration against him through the bar association.

Despite the availability of these options, in his final analysis Kittleson urged the Nelvises to reject Cream Puff's offer, stating that "[i]t is my professional opinion that your recovery will be much greater than this at trial. Furthermore, if you win the Consumer Protection Act claims, which I think are your strongest claims, then [Cream Puff] would be required to pay full attorney fees." In keeping with Kittleson's recommendation, the Nelvises rejected Cream Puff's offer.

Two months later, in response to the bar association's opinion and "the current status of the case," Kittleson revised his fee agreement with the Nelvises. The new agreement omitted the fee-conversion clause and called for Kittleson to be paid a pure one-third contingency fee from any recovery. But Cream Puff evidently extended no further offers of judgment.

In May 2003 the Nelvises' case went to trial. Cream Puff prevailed on all claims. Given the Nelvises' rejection of its pretrial offer, the dealership moved for an award of costs and enhanced attorney's fees under Civil Rule 68 and AS 09.30.065. The court granted the motion and entered judgment against the Nelvises for fees and costs totaling $99,169.19.

The judgment forced the Nelvises to file for bankruptcy. Bankruptcy Trustee Larry D. Compton then sued Kittleson in superior court for legal malpractice in connection with his use of the "convertible fee" agreement. The parties stipulated that no issues of fact existed and that the only issue presented was whether the disputed fee agreement's conversion clause "is prohibited by Alaska law"; Compton then filed a motion for summary

judgment and Kittleson filed an opening brief seeking dismissal of the action.

After hearing oral argument on the point, Superior Court Judge Sen K. Tan concluded "that the agreement as written, on its face, leaves the decision to settle with the client and does not impinge on the client's right to make that decision." On this basis the court determined "that the plain language of the agreement does not violate Alaska law." While recognizing that the agreement might be invalid if it resulted in an unreasonable fee, the court observed that "[t]he reasonableness of the fees charged to a client is a question of fact and not before this court." Accordingly, given the parties' stipulation, the court denied Compton's motion for summary judgment and dismissed the complaint.

Compton appeals.

### III. DISCUSSION

■ On appeal, the parties address the single point of law raised before the superior court: whether the specific fee-conversion provision at issue here violates Alaska law— more particularly, the Alaska Rules of Professional Conduct—by impermissibly burdening a client's right to control settlement.

Compton argues that Kittleson's "convertible fee" agreement interferes with a client's right to settle a case in violation of the Rules of Professional Conduct. He insists that asking a client to agree at the outset of a case to convert a pure contingent-fee arrangement to an hourly fee upon settlement penalizes the client for settling and imposes an intolerable restriction on the client's right to decide whether and when to settle. Compton suggests that the conversion clause's restrictive effect is deliberate, rather than incidental, emphasizing that Kittleson's use of the clause in small-dollar consumer protection cases reflects his desire to maximize his prospects of winning full statutory attorney's fees under the Consumer Protection Act, a right that attaches only when a claimant prevails at trial.[2]

In response, Kittleson acknowledges that clients generally retain primary control over settlement decisions and have the right to

**2.** *See* AS 45.50.537.

settle without the intervention, knowledge, or consent of their attorneys. But he maintains that an attorney-client agreement does not violate the Rules of Professional Conduct unless it expressly restricts a client's right to accept or reject a settlement offer—a restriction that, in Kittleson's view, the disputed conversion clause did not contain.

■ Because the parties have stipulated that there are no genuine issues of material fact, their dispute presents a question of law, which we review independently, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[3]

In ruling that Kittleson's fee agreement was permissible, the superior court focused largely on whether the Alaska Rules of Professional Conduct categorically prohibit the use of agreements providing for hybrid fees. The court concluded that hybrid-fee agreements do not violate the professional conduct rules per se, as long as the fee ultimately charged complies with Rule 1.5's directive that a lawyer's fee "shall be reasonable."[4] As a general matter, this conclusion is unassailable. The plain language of Rule 1.5, which regulates attorney's fees, implicitly recognizes that hybrid-fee agreements are not categorically barred: "A fee agreement which is *in whole or in part contingent* shall be in writing and shall state the method by which the fee is to be determined...."[5]

■ Moreover, even though we have never squarely upheld the validity of hybrid-fee agreements under Alaska law, we have tacitly condoned their use on at least one occasion by upholding a hybrid agreement against a challenge directed at the reasonableness of the particular fee at issue in the appeal, noting that "[a]lthough the combined hourly and contingent fee arrangement was unconventional, it was not unreasonable."[6] Our recognition that hybrid agreements may properly be used in some situations appears to reflect the prevailing view in other jurisdictions.[7] We thus conclude that an attorney's use of a hybrid-fee agreement does not necessarily breach the Alaska Rules of Professional Conduct.

Yet the conclusion that hybrid agreements may sometimes be properly used hardly establishes that such agreements are always facially valid or that the particular type of hybrid agreement used by Kittleson was permissible as a matter of law. Here, the hybrid agreement combines two active ingredients into a potent mix: first, it uses the client's decision to settle as the trigger for converting from contingent to hourly fees; then, once the conversion is triggered, it operates retroactively to encompass all work performed from the inception of the case. Whether Alaska law prohibits this type of hybrid-fee arrangement presents a question of law that cannot be decided without assessing the combined effects of these features in light of requirements imposed by the Alaska Rules of Professional Conduct and other relevant provisions of Alaska law.

■ Alaska's Rules of Professional Conduct follow the mainstream in recognizing that clients, and not attorneys, possess the right to decide whether to settle or drop a case. Because this right is personal to the client, an attorney cannot demand relinquishment of the right as a condition of representation. Rule 1.2(a) provides that "[a] lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter." Other authorities support this strict view

---

3. *In re K.A.H.*, 967 P.2d 91, 93 (Alaska 1998) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

4. *See* Alaska R. Prof. Conduct 1.5(a).

5. Alaska R. Prof. Conduct 1.5(c) (emphasis added).

6. *State, Pub. Employees Ret. Bd. v. Cacioppo*, 813 P.2d 679, 685 n. 14 (Alaska 1991).

7. *See, e.g., City of Burlington v. Dague*, 505 U.S. 557, 560, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ("Fees for legal services in litigation may be either 'certain' or 'contingent' (or some hybrid of the two)."); *Gilbert v. Evan*, 822 So.2d 42, 46 (La.App.2002) ("There is no law prohibiting this hybrid contingency fee contract nor has any court declared such contracts invalid because they are against public policy."). *But cf. Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1032 n. 12 (Pa.Super.2005) ("The absence of any provision in the [Pennsylvania Rules of Professional Conduct] for 'hybrid' agreements suggests that such agreements, while perhaps permissible, should be closely scrutinized.").

that the right belongs to the client alone. The American Bar Association's *Annotated Model Rules of Professional Conduct* emphasize that "[a] lawyer has no inherent power, by virtue of the fact that he or she represents a client, to settle the client's claim."[8] The Restatement (Third) of the Law Governing Lawyers explains that the decision to settle is reserved to the client "because a settlement definitively disposes of client rights."[9] And Charles W. Wolfram's treatise, *Modern Legal Ethics,* notes that a lawyer may, at times, have a duty to encourage a client to settle, but "the decision whether or not to settle is for the client to make."[10]

Applying these principles, courts have consistently declined to enforce fee agreement provisions that give attorneys control over settlement by requiring the attorney's approval or by requiring the client to accept an offer that the attorney considers favorable.[11] Because these cases rest their outcomes on the personal nature of the right to settle, they do not consider it relevant to inquire into how clients' choices might affect the economic interests of their attorneys. For example, in *Mattioni, Mattioni & Mattioni, Ltd. v. Ecological Shipping Corp.,* a law firm sued a former client based on a provision in

its fee agreement stating that the client "agrees not to compromise its suit without its attorneys' consent" after the client negotiated a settlement without the firm's involvement.[12] The United States District Court held that despite the firm's reasonable expectation of a "very substantial fee" for its work on the client's behalf, the consent provision of the fee agreement violated public policy and could not support the firm's claims against its former client.[13] The court went on to observe that if the client's actions unfairly deprived the attorney of a reasonable expectation of compensation, the attorney's proper remedy would not be to enforce the void fee agreement but rather to seek recovery of the reasonable value of services rendered under a theory of quantum meruit.[14]

Also relevant are cases declining to enforce fee agreements that interfere with the client's analogous right to end the attorney-client relationship.[15] In confirming that this right belongs exclusively to the client, courts have invalidated not only agreements that directly restrict the client's ability to exercise the right, but also agreements that use mechanisms such as nonrefundable retainers[16] to discourage exercise of the right by burdening it indirectly.[17] As the New York Court of

---

8. ANN. MODEL RULES OF PROF'L CONDUCT R. 1.2 legal background at 16 (4th ed.1999).

9. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 22 cmt. d (2000).

10. CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 4.6.2 (1986).

11. *See, e.g., Mattioni, Mattioni & Mattioni, Ltd. v. Ecological Shipping Corp.,* 530 F.Supp. 910, 913 (E.D.Pa.1982); *In re Lansky,* 678 N.E.2d 1114, 1116 (Ind.1997); *Parents Against Drunk Drivers v. Graystone Pines Homeowners' Ass'n,* 789 P.2d 52, 55 (Utah App.1990); *Butler v. Young,* 121 W.Va. 176, 2 S.E.2d 250, 251 (1939). *But see Ramirez v. Sturdevant,* 21 Cal.App.4th 904, 26 Cal.Rptr.2d 554, 561 (1994) (holding that term in supplemental retainer agreement requiring client to accept settlement offer of $150,000 or more did not breach attorney's fiduciary duty to client).

12. *Mattioni,* 530 F.Supp. at 912.

13. *Id.* at 912–14.

14. *Id.* at 914.

15. Alaska R. Prof. Conduct 1.16(a)(3); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 31 cmt. d ("A client and lawyer cannot validly enter a contract forbidding the client to discharge the lawyer.").

16. Some courts refer to such agreements as "special retainers" to distinguish them from generally permissible nonrefundable fees that are paid in exchange for an attorney's promise to be available to perform legal services during a specified period of time. See *Wong v. Michael Kennedy, P.C.,* 853 F.Supp. 73, 79–80 (E.D.N.Y.1994); *In re Cooperman,* 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069, 1070 (1994); *Cuyahoga County Bar Ass'n v. Okocha,* 83 Ohio St.3d 3, 697 N.E.2d 594, 597 (1998) (nonrefundable retainers appropriate only when used to make lawyer available or preclude lawyer from providing services to client's competitor).

17. *See, e.g., Wong,* 853 F.Supp. at 79–80 (nonrefundable retainer requiring client to pay $225,000 for specified services invalid); *AFLAC, Inc. v. Williams,* 264 Ga. 351, 444 S.E.2d 314, 316–17 (1994) ("damages" clause of retainer agreement providing monetary penalty in event that client prematurely terminated multi-year re-

Appeals stated in *In re Cooperman*, an attorney disciplinary case, the problem with "special nonrefundable retainers" is that they "alter[ ] and economically chill[ ] the client's unbridled prerogative to walk away from the lawyer." [18] The court added that to "answer that the client can technically still terminate misses the reality of the economic coercion that pervades such matters." [19]

In their treatise, *The Law of Lawyering*, professors Geoffrey C. Hazard, Jr. and W. William Hodes conclude that the pressure inherent in convertible fee agreements makes them unacceptable. Describing an analogous fee-conversion provision, albeit one triggered by a client's decision to reject a settlement offer, they write:

> Even if an adequately counseled client had agreed in advance to such an arrangement, it probably could not stand in the face of Model Rule 1.2(a) and Restatement § 22, which allocate decisions as to settlement to the client.... Although a lawyer can and should forcefully argue against rejection of an offer that ought to be accepted, she cannot use this form of economic coercion to force the issue.[20]

A number of bar association ethics opinions support this view, ruling that conversion agreements are invalid if they change contingent fees to hourly fees when a client wishes to accept a settlement that the attorney thinks is inadequate. The State Bar Professional Ethics Committee of Wisconsin has written, after describing such an agreement:

> In that situation, it would be improper for the lawyer to attempt to charge on an hourly basis. If the lawyer were permitted to charge on an hourly basis, the client, to some extent, loses control of his case as he or she would face the choice of a law-

yer's bill he cannot afford and a lawsuit which he or she doesn't want to pursue. Moreover, the large attorney's fees which are generated by the contingent fee can only be justified because of the risks the lawyers must bear of not making an adequate recovery to cover his or her time in certain cases. The client's desire to accept a less than satisfactory settlement offer is an inherent part of that risk. To suggest a lawyer can have it both ways with the use of the proposed clause is not acceptable to the committee.

> Therefore, to include the proposed language in the contingent fee contract so as to permit charging a client on an hourly basis if the lawyer deems a settlement offer inadequate, is, in the opinion of the committee, overreaching and, therefore, unethical.[21]

The Nebraska State Bar Association's ethics committee reached a similar conclusion:

> It is the opinion of the Committee that a contractual agreement whereby a client electing to settle a case for an amount less than the amount which the attorney believes is the reasonable value of the case, may be charged an hourly fee, instead of the contingent fee otherwise agreed upon, unduly restricts the client's ability to accept settlement offers and may result in excessive charges. Such a contractual provision is not permissible.[22]

And the Ethics Committee of the Colorado Bar Association has similarly indicated that "a contingent fee agreement that converts to an alternate fee if the client settles a claim (or refuses to accept a settlement) contrary to the attorney's advice is void." [23]

We note that this discussion of convertible fee agreements did not appear in the edition of Hazard and Hodes that was in circulation at the time that the fee agreement in this case was made.

tainer invalid as unreasonable infringement on client's right to discharge attorney); *In re Cooperman*, 611 N.Y.S.2d 465, 633 N.E.2d at 1072–73 (divorce lawyer disciplined for routinely charging $5,000 nonrefundable retainer).

18. *In re Cooperman*, 611 N.Y.S.2d 465, 633 N.E.2d at 1072.

19. *Id.*

20. 1 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 8.15 (3d ed. Supp.2003).

21. Wis. State Bar Prof'l Ethics Comm., Formal Op. E–82–5 (1982).

22. Neb. State Bar Ass'n Lawyers' Advisory Comm., Formal Op. 95–1 (1995).

23. Colo. Bar Ass'n Ethics Comm., Formal Op. 100 (1997).

The case at bar exemplifies the tensions created by the structure of hybrid agreements like the one used by Kittleson. Under a pure contingent-fee agreement, the Nelvises would have recovered approximately $15,000 from Cream Puff's $25,000 offer— only slightly less than the price they paid for the used car. But under the fee-conversion provision, Kittleson's fees, when calculated at the agreement's hourly rate, exceeded the amount of Cream Puff's offer, leaving the Nelvises with *less than* nothing: under the hybrid agreement, accepting the offer would have triggered the conversion from contingent to hourly fees, thus obliging the Nelvises to pay Kittleson more than $30,000 in fees while giving them only $25,000 to satisfy the new obligation.[24]

The impact of this "fee surprise" is compounded by the predictable difficulty of forecasting the effects of the fee-conversion provision. Given the number of variables involved—the merit and strength of the client's claims, the probable timing and size of a settlement offer, and the work required to achieve settlement—it seems unrealistic to expect that prospective clients like the Nelvises would be able to appreciate the risks and benefits of the disputed fee provision. It seems unlikely, too, that the attorney-client agreement between Kittleson and the Nelvises, with a single sentence devoted to the fee-conversion provision, satisfies an attorney's duty to fully explain the terms of a fee agreement in such a way that the client can understand.[25]

In defense of his agreement, Kittleson argues that attorney's fees are a "constant pressure" in almost any litigation and quite often influence settlement decisions. Kittleson also contends that the Nelvises "would have been in exactly the same position" had they entered into a traditional hourly fee agreement. While it is true that the costs of litigation often influence strategy, Kittleson's response ignores a key distinction between a convertible fee agreement and one based on straight hourly fees: the delayed impact of actuating a "springing" obligation to pay for work already performed but never before chargeable to the client. Because the potential cost of a future obligation of this kind and the potential value of the right the client is asked to forgo to avoid the obligation are both largely incalculable at the inception of the attorney-client relationship, when the fee agreement is signed, we conclude that the fee-conversion provision at issue here impermissibly burdens the client's right to settle a case.

Kittleson nonetheless defends the convertible fee agreement as justified on public policy grounds. He notes that Alaska's consumer protection laws are designed to encourage the use of private damages actions as a means of curtailing unfair trade practices.[26] He further notes that, to encourage attorneys to handle such cases, Alaska law also authorizes an award of "full reasonable attorney fees at the prevailing reasonable rate" when the client wins a claim at trial.[27] According to Kittleson, then, to give full effect to the legislative intent, the attorney must be allowed to include an "hourly component" to a standard contingent-fee agreement in order to promote the attorney's ability to earn full fees. "It is not the law or an ethical canon that an attorney must work for free," Kittleson reasons, "and because the Legislature wants to encourage private enforcement and representation ... it is imperative that attorneys in the consumer protection arena be allowed to utilize fee agreements that lead to adequate compensation."

Moreover, Kittleson alleges systematic abuses in such cases by defendants who use a "divide and conquer" strategy that aims to

---

24. While Kittleson did offer to reduce his fees to $22,000, allowing the Nelvises to recover $1,500 after repayment of costs, this limited, post-offer-of-judgment concession does not alter the analysis of whether the hybrid agreement was legally valid at the time it was made.

25. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. d. ("In entering a contract at the outset of a representation, the lawyer must explain the basis and rate of the fee ... and advise the client of such matters as conflicts of interest, the scope of the representation, and the contract's *implications for the client ....*") (emphasis added).

26. *See* AS 45.50.531.

27. AS 45.50.537.

encourage early settlement by clients for modest sums, while driving up unrecoverable costs to their attorneys. Kittleson suggests that a hybrid hourly fee provision like the one he uses is justified as a response to these abuses; he asserts that as matters currently stand, it is difficult for consumers like the Nelvises to find attorneys willing to handle small unfair practices claims.

 Although Kittleson offers no support for his claim that a shortage of willing attorneys exists, we readily accept his premise that the attorney's fees provisions of Alaska's consumer protection laws were designed to encourage attorneys to handle consumer protection complaints, even when they are small. Yet the policy of encouraging attorneys to participate in these cases subserves the Consumer Protection Act's overarching goal of encouraging small consumer protection claims. It hardly follows that this broader policy goal would be served by a fee agreement enabling attorneys to compromise the procedural rights of their clients—the parties whose rights the law ultimately strives to promote. To the contrary, it would seem anomalous to encourage the successful resolution of consumer rights claims by adopting a practice designed to penalize the claimant for accepting a reasonable offer to settle. In light of the ethical and practical dangers posed by the hybrid agreement, then, we think that Kittleson's policy arguments lack merit.

## IV. CONCLUSION

We conclude that the type of hybrid-fee agreement disputed here is prohibited under the Alaska Rules of Professional Conduct and other provisions of Alaska law because of its potential to restrict a client's exclusive right to accept or reject an offer of judgment. We therefore REVERSE the superior court's order dismissing Compton's complaint and REMAND for entry of summary judgment in favor of Compton.

FABE, Chief Justice, not participating.