Howard WEINER and Katherine
A. Garrison, Appellants,

v.

BURR, PEASE & KURTZ, P.C., an
Alaska Professional Corporation,
Appellee.

No. S–13214.

Supreme Court of Alaska.

Nov. 13, 2009.

Charles E. Tulin, Anchorage, for Appellants.

Richard A. Helm, Bookman & Helm, LLP, Anchorage, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

## OPINION

CHRISTEN, Justice.

## I. INTRODUCTION

This appeal involves a dispute over the modification of a law firm's contingent-fee agreement. The main questions presented are whether the modified contingent-fee agreement is valid and whether the court erred in construing the disputed phrase— "further substantial litigation"—to mean more than just in-court proceedings and filings. Because the modified fee agreement is valid and the superior court's interpretation of "further substantial litigation" was not erroneous, we affirm the grant of summary

judgment for the law firm. The issue of costs was not before the superior court; it did not err by not addressing costs. Finally, the court's Civil Rule 68 fee award was not an abuse of discretion.

## II. FACTS AND PROCEEDINGS

### A. Facts

In September 2004 Howard Weiner and Katherine Garrison (collectively "the clients") retained Burr, Pease & Kurtz, P.C. ("BPK") to represent them in a personal injury lawsuit against Katmai Lodge, Ltd. and its owner Anthony Sarp. The facts of the underlying lawsuit are undisputed: the clients sustained injuries when the stairs to their respective rooms at Katmai Lodge collapsed. Per the legal services contract, the clients agreed to pay BPK "25% if a resolution of the claim is made before filing a complaint; 33% if a resolution of the claim is made after the filing of a complaint; 40% if a resolution of the claim is made after the filing of an appeal."

BPK filed the complaint on behalf of the clients against Katmai Lodge and Sarp in June 2005. By then, Katmai Lodge had filed for bankruptcy. BPK sought funds from the bankruptcy estate on behalf of the clients and hired counsel in Washington to represent the clients in the bankruptcy proceedings. BPK treated this expense as a client cost.

In August 2005 BPK sent the clients a letter advising them to agree to make a policy limits settlement offer. BPK warned the clients "that your expectations about the value of your case may not translate well to an Anchorage jury." BPK estimated that if the insurer agreed to settle for policy limits, the total recovery for the clients would be $1,122,109.85, including prejudgment interest, costs (estimated at $3,222.35) and fees.

The clients responded that month by offering to agree to settle their claims for policy limits, on the condition that the insurer pay within sixty days. They also asked BPK to reduce its fees if this policy limits settlement occurred, stating the clients were "proposing that [BPK] accepts a total of $250,000 legal fees plus any remaining unpaid costs."

In a series of written communications, the parties negotiated the clients' request that BPK reduce its fees. BPK proposed the following modifications to the contingent-fee agreement:

> After consulting with the firm's executive committee we have agreed to your proposal. We will try to obtain a policy limits settlement of your claims. Should we succeed without requiring further substantial litigation we will be paid 1) our out-of-pocket costs and 2) $250,000.

> If our efforts at an early settlement do not succeed and it becomes necessary to litigate the matter in a substantive way, we will revert back to our previous written fee agreement and the percentages written there.

Two days later the clients replied by e-mail that they "agree[d] to the fees as outlined" by BPK. By this time, the clients had also agreed to make the policy limits settlement offer. The parties did not reduce the modified fee agreement to one comprehensive writing, define its terms, or establish any procedures for "revert[ing] back" to the original fee agreement.

BPK made a policy limits demand on October 27, 2005. Katmai and Sarp rejected it on May 10, 2006. Both before and after the settlement offer was rejected, BPK was preparing for trial, scheduled for February 2007. BPK also prepared for and participated in a December 2006 mediation. In November and December 2006 BPK again informed the clients of the stages and risks of trial, and the reasons for pursuing a policy limits settlement. BPK listed hypothetical recoveries if the case settled for policy limits, if it went to a jury trial, and if it was appealed. In each of these hypothetical scenarios, BPK listed what the distribution of the recovery would be after deducting fees and costs. Each scenario reflected BPK's fees as thirty-three percent of the recovery and estimated its costs, including the Washington bankruptcy attorney's fees, as being at least $35,000. For instance, in a letter dated November 17, 2006, BPK predicted that if the case settled for policy limits without going to trial, the distribution would be as follows:

| | |
|---|---|
| Gross Settlement or award: | $1,000,000 |
| Attorneys fee (33%) | $ 333,333 |
| | $ 666,667 |
| Medical Liens (less 33% fee): | $ 55,666 |
| Costs advanced by BPK: | $ 35,000 |
| Net to clients: | $ 576,001 |

BPK calculated its fees as being thirty-three percent of the total recovery five times, in five different settlement scenarios. The clients did not raise any objection to BPK's use of a thirty-three percent contingency fee in these scenarios.

In January 2007 the underlying case settled for policy limits, which amounted to $1,231,025.31. BPK sent the clients a letter showing how the funds would be distributed. In this letter, BPK again calculated its fee as thirty-three percent of the recovery, or $406,238.34. The next day the clients sent BPK an e-mail objecting to the contingency fee. They complained that they understood that under the modified fee agreement, if the case settled for policy limits at any point, BPK would receive a flat fee of $250,000 plus costs. In the following days and weeks BPK expressed its disagreement with the clients' understanding of the fee contract and placed the settlement proceeds in an interest-bearing trust account until resolution of the fee dispute.

In February 2007 BPK and the clients agreed to distribute the undisputed settlement funds but keep the disputed fees ($156,-238.34) in the trust account. BPK then sent the clients a letter with calculations for disbursing the settlement funds—including the clients' recovery after deducting BPK's total disputed and undisputed fees ($406,238.34) and costs advanced ($40,679.43). BPK also clarified it did "not intend to pay [its] costs advanced" until it received permission to do so from the clients, included a print-out of costs, and invited the clients to express any concern over those costs.

### B. Proceedings

In September 2007 the clients filed a complaint for recovery of the disputed attorney's fees, and several months later moved for summary judgment. The clients argued that the parties did not dispute the facts surrounding contract modification and that the only question presented was one of contract interpretation. On that issue, the clients argued that "further substantial litigation" should be interpreted as "meaning that a flat fee of $250,000 would be paid to [BPK] unless the parties engaged in a considerable amount of in court filings and proceedings after October 19, 2005." According to the clients, "[b]ecause the parties did not engage in any court proceedings or considerable in court filings after that date, but prepared for and participated in mediation and an out of court settlement, the 'further substantial litigation' provision was not triggered and defendants are bound by the $250,000 flat fee agreement."

In a cross-motion for summary judgment and in its opposition to the clients' summary judgment motion, BPK quoted the language of the fee proposal to which the clients had agreed: "If our efforts at an early settlement do not succeed and it becomes necessary to litigate the matter in a substantive way, we will revert back to our previous written fee agreement and the percentages written there." It argued "litigation" includes more than in-court proceedings and filings, and that "as a matter of law, the case was litigated in a substantive way following the amendment to the [fee] contract" and thus, it "is entitled to its full 33% contingent fee."

After oral argument, the court issued an oral ruling on the record. Because the parties did not dispute any extrinsic evidence, the court addressed only the legal question of contract interpretation. The court looked to dictionary definitions of the relevant terms—"further," "substantial," "litigation," "to litigate," and "early." Based on these definitions, the court interpreted "further substantial litigation" to mean "additional considerable efforts in carrying on the legal contest." The court construed the parties' modified fee agreement as follows:

> [S]hould the firm succeed in obtaining the policy limits without undergoing additional considerable efforts in carrying on the legal contest, the firm will be paid out of pocket expenses and a flat fee of $250,000. And if efforts of the settlement near the beginning of the process of litigation do not succeed and it becomes necessary to

engage in additional considerable efforts in carrying on the legal contest, the parties will revert to the previous written agreement.

Applying this interpretation to the undisputed facts, the court concluded that BPK had engaged in "further substantial litigation," entitling it to a thirty-three percent contingency fee under the original fee agreements. The court also found the case law cited by the clients to be distinguishable and "not persuasive" and that the clients "argued the costs claimed were the same whether the fees were a flat $250,000 or 33 percent."

The court granted summary judgment to BPK on its claim for attorney's fees, noting that "neither party raised the costs being claimed by [BPK] as at issue in the complaint or answer." The clients moved for reconsideration, asserting that costs incurred in the underlying lawsuit, including the Washington bankruptcy attorney's fees, were at issue in the fee-contract dispute. BPK opposed the motion and the court denied it, accepting BPK's revised judgment, which made no reference to those costs.

In August 2008 BPK moved for attorney's fees under Civil Rule 82 and costs incurred in defending the fee dispute. BPK argued for fees under Rule 82 or, alternatively, under Rule 68 because it had served offers of judgment on the clients in September of 2007. The court first concluded that Rule 82(b)(2) [1] applied. The clients opposed awarding fees under Rule 82(b)(2) and argued that any award should be reduced under Rule 82(b)(3). [2] The court later changed course and awarded fees under Rule 68 only, explaining "payments under [Civil Rules] 68 and 82 cannot be combined." In September 2008 the court awarded BPK the disputed portion of its fees ($156,230.34) plus interest;

$2,387.21 in costs incurred in the fee-contract dispute; and $8,395.95 in attorney's fees under Rule 68.

The clients appeal.

## III. STANDARD OF REVIEW

■■■ When there are no genuine issues of material fact and the question presented involves only the legal one of contract interpretation, we review the superior court's grant of summary judgment de novo. [3] We will affirm if the undisputed facts, viewed in the light most favorable to the non-prevailing party, entitle the prevailing party to judgment as a matter of law. [4]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Granting Summary Judgment for BPK.

The clients argue that we should reverse the superior court's grant of summary judgment for three main reasons: (1) the fee agreement is invalid under *Compton v. Kittleson* [5] and Alaska Rule of Professional Conduct 1.5(c); (2) the court failed to construe the attorney-client contract against BPK and improperly interpreted the term "further substantial litigation"; and (3) it was error to find that BPK engaged in "further substantial litigation."

### 1. The modified contingent-fee agreement is valid under *Compton* and Alaska Rule of Professional Conduct 1.5(c).

#### a. The modified contingent-fee agreement is valid under *Compton*.

■■■ The clients argue the modified fee agreement is an impermissible hybrid agree-

---

1. Civil Rule 82(b)(2) governs attorney fee awards in cases not involving money judgments.

2. Civil Rule 82(b)(3) permits courts to deviate from the fee schedules in (b)(1) and (b)(2) if the court determines that any of eleven factors justifies such a deviation.

3. *Compton v. Kittleson*, 171 P.3d 172, 176 (Alaska 2007) (citing *In re K.A.H.*, 967 P.2d 91, 93 (Alaska 1998)) ("Because the parties have stipulated that there are no genuine issues of material fact, their [contract interpretation] dispute pres-

ents a question of law, which we review independently, adopting the rule of law that is most persuasive in light of precedent, reason, and policy." (alteration added)).

4. *Law Offices of Steven D. Smith, P.C. v. Borg–Warner Sec. Corp.*, 993 P.2d 436, 443 (Alaska 1999); *see also Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005).

5. 171 P.3d 172.

ment under *Compton* because they believe it gave BPK control over the decision to engage in "further substantial litigation." The superior court disagreed.

The fee agreement in this case, and the circumstances under which the parties modified it, differ from the fee contract and circumstances in *Compton*. There, we held impermissible a fee agreement that used the client's decision to settle as "the trigger for converting from contingent to hourly fees" and that operated "retroactively to encompass all work performed from the inception of the case."[6] Before agreeing to undertake the representation, the attorney in *Compton* presented his clients with a proposed fee agreement under which he would receive thirty-three percent of any recovery.[7] But the agreement also provided that if the clients settled for an amount that yielded a fee equal to less than $175 per hour for the time the attorney invested, he would be paid "an amount over and above the 33% to compensate [him] at the rate of $175.00 per hour."[8]

After representation was underway, the attorney received a settlement offer for $25,000, including costs and attorney's fees.[9] He communicated the settlement offer to the clients and informed them that because his hourly fees for work performed to that date already exceeded $30,000, accepting the offer "would mean no recovery" for the clients.[10] The clients rejected the offer, and although the attorney later revised the fee agreement to omit the "fee-conversion clause," the defendant made no further offers and the clients lost on all claims at trial.[11]

We held the *Compton* fee agreement invalid because it both impeded the clients' right to control the decision to settle and imposed

a " 'springing' obligation to pay for work already performed but never before chargeable to the client[s]."[12] We reasoned:

> Because the potential cost of a future obligation of this kind and the potential value of the right the client is asked to forego to avoid the obligation are both largely incalculable at the inception of the attorney-client relationship, when the fee agreement is signed, we conclude that the fee-conversion provision at issue here impermissibly burdens the client's right to settle a case.[13]

The modified contingent-fee agreement here is significantly different: it did not base BPK's compensation on the clients' decision to settle. Rather, under the original agreement, BPK was to receive twenty-five percent of a recovery reached before filing a complaint, thirty-three percent after filing a complaint, and forty percent after filing an appeal.[14] The parties modified their agreement because the clients requested that BPK reduce its fees in the event of an early settlement. They made this request after having had the opportunity to review BPK's detailed assessment of the case's potential value and the risks of trial. Further, the modified fee agreement based BPK's compensation not on whether the clients agreed to make the settlement offer—they already had—but instead on whether the insurer accepted the offer early in the case.

Nor did BPK control whether "further substantial litigation" would ensue; the early settlement offer was not successful because Katmai Lodge and Sarp did not accept it. BPK had a duty to prepare for trial. The record shows the clients wanted to continue pursuing their claims for at least the policy limits, knew BPK was doing so at

---

6. *Compton,* 171 P.3d at 176.

7. *Id.* at 174.

8. *Id.* (alteration added).

9. *Id.*

10. *Id.* at 174–75.

11. *Id.*

12. *Id.* at 179.

13. *Id.*

14. In their reply brief the clients appear to argue the original fee agreement is also impermissible under *Compton* because it provides for higher fee percentages depending on whether a complaint or an appeal has been filed. Because they did not raise this argument in their opening brief, the clients waived it. *See Sumner v. Eagle Nest Hotel,* 894 P.2d 628, 632 (Alaska 1995); Alaska R.App. P. 212(c)(3).

their direction, and did not ask BPK to stop litigating their claims. Indeed, BPK's billing entries show BPK and the clients had numerous teleconferences throughout the case, particularly from the time Katmai Lodge and Sarp rejected the policy limits settlement offer in May 2006 until the time the case settled in January 2007.

*Compton* is also distinguishable because the modified fee agreement here did not retroactively impose a fee obligation the clients would not otherwise have been charged.[15] The clients here would have paid BPK a flat fee of $250,000 plus costs if an early settlement had occurred. If the case did not settle at an early stage and "substantial litigation" ensued, the clients were obligated to pay BPK thirty-three percent of any recovery plus costs, per the original agreement. In either scenario the clients had to pay if they received a recovery; neither scenario imposed fees otherwise not chargeable.

Because the parties' modified fee agreement did not impermissibly burden the clients' right to control the decision to settle or impose fees otherwise not chargeable, we conclude it is valid under *Compton*.

### b. The parties' writings described how to determine BPK's fee.

■ The clients argue that the modified fee agreement is invalid under Alaska Rule of Professional Conduct 1.5(c), which states: "[a] fee agreement that is in whole or part contingent shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal."[16]

The parties modified their written fee agreement over a series of letters and e-mails; the clients concede that the modified fee agreement met the writing requirement. But the clients argue the modified fee agreement fails to comply with Rule 1.5(c) because "there was no evidence in writing that [the clients] agreed to return to the 33% contin-

gent contract, or that [the clients] agreed that BPK could engage in 'further, substantial litigation' thus triggering the reversion."

We agree it would have been preferable to acknowledge in writing the point at which the "substantial litigation" threshold had been reached, but the letters that BPK sent the clients after the fee agreement was modified and before settlement occurred communicated that BPK was investing significant effort in pursuit of the clients' legal claims and, by November 2006, made clear that BPK believed it was entitled to a thirty-three percent contingency fee. The clients neither objected to the thirty-three percent contingency fee until after a tentative settlement had been reached nor instructed BPK not to pursue their claims. And the record shows BPK had numerous phone calls and teleconferences with the clients, indicating the clients must have known BPK was engaging in substantial work. BPK did not leave the clients in the dark about the extent to which it was pursuing their claims or the fee it believed it was owed. Under the circumstances of this case, any failure to announce that the "substantial litigation" threshold had been reached did not prejudice the clients.

### 2. The superior court's interpretation of the modified contingent-fee agreement was not erroneous.

The clients complain the court's interpretation of the modified fee agreement was erroneous and that they were entitled to summary judgment. They argue the court (1) improperly interpreted the contract in favor of BPK and (2) erroneously construed "further substantial litigation" to include more than in-court proceedings and filings.

Because the parties agree on the facts and circumstances surrounding modification of the fee agreement and the agreement's language, and because neither party argues there are genuine issues of material fact, this dispute presents only the legal question of contract interpretation.[17]

---

15. *See Compton,* 171 P.3d at 179.

16. Alaska R. Prof. Conduct 1.5(c).

17. *See Compton v. Kittleson,* 171 P.3d 172, 176 (Alaska 2007) (citing *In re K.A.H.,* 967 P.2d 91, 93 (Alaska 1998)).

In their reply brief the clients appear to contend that there are genuine issues of material

### a. The superior court properly construed the contract against BPK.

■ The clients contend that the modified fee agreement was ambiguous, requiring the court to construe it against BPK, and that the court improperly interpreted the agreement in favor of the law firm.[18] This argument is not persuasive. The superior court both acknowledged the principle of construing attorney-fee contracts against attorneys and construed the modified fee agreement against BPK.

### b. The superior court properly interpreted the phrase "further substantial litigation" to include more than in-court proceedings and filings.

■ The clients argue the phrase "further substantial litigation" means only in-court proceedings and filings, such as appearing in trial before a court or jury, but not preparing for or participating in mediation.

The trial court interpreted "further substantial litigation" as meaning "additional considerable efforts in carrying on the legal contest." It reasoned that limiting "further substantial litigation" to in-court proceedings and filings "is unrealistic as litigation and court proceedings are more like an iceberg: 90 percent of the activity involved in litigation is not in court, but in preparing the case for the various court filings and proceedings, including trial." In reaching its conclusion, the court considered dictionary definitions for the disputed terms, defining (1) "further" as "additional," (2) "to litigate" as "to carry on a legal contest by judicial process," (3) "litigation" as "the process of carrying on a lawsuit" or "a legal proceeding of a civil kind," (4) "substantial" as "considerable in

quantity; significantly great," and (5) "early" as "near the beginning of a course [of] process; or occurring in a near future." The court applied these definitions to the modified fee agreement:

> Putting the definitions together, even construing the contractual language against [BPK], a reasonable person would understand that should the firm succeed in obtaining the policy limits without undergoing additional considerable efforts in carrying on the legal contest, the firm will be paid out of pocket expenses and a flat fee of $250,000. And if efforts of the settlement near the beginning of the process of litigation do not succeed and it becomes necessary to engage in additional considerable efforts in carrying on the legal contest, the parties will revert to the previous written agreement.

We agree with the court's interpretation and conclude reasonable persons in the clients' circumstances would not have expected "further substantial litigation" to mean purely in-court proceedings and filings to the exclusion of work done in preparation for mediation or trial.

■ As the superior court noted, we have not articulated standards for interpreting attorney-fee contracts. The Restatement (Third) of the Law Governing Lawyers provides helpful guidance, and we adopt its general rule: "A tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it." [19] In addition to this principle, attorney-client contracts are to be construed as any other contract, using general rules of contract interpretation.[20]

---

fact as to the parties' intent in modifying the fee agreement. But they again failed to raise this argument in their opening brief, and we consider arguments first raised in a reply brief waived. *See Sumner v. Eagle Nest Hotel*, 894 P.2d 628, 632 (Alaska 1995); Alaska R.App. P. 212(c)(3).

**18.** "[A]mbiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms." *N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005) (quoting *Wessells v. State, Dep't of Hwys.*,

562 P.2d 1042, 1046 (Alaska 1977)) (internal quotation marks omitted).

**19.** RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18(2) & cmt. h (2000) (explaining three reasons for this principle: lawyers usually write fee contracts, are more able to discern deficiencies and to correct them, and consider it important to inform clients about risks that may occur during the representation).

**20.** *See id.* (explaining the principle of construing an attorney-fee contract as a reasonable client would "does not preclude the reliance on the

Typically, in "resolving disputes concerning the meaning of an agreement, [we] begin[ ] by 'viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms,' in order to determine if those terms are ambiguous—that is, if they are 'reasonably subject to differing interpretation,'"[21] and if those differing interpretations are both reasonable.[22] If we conclude an ambiguity exists, we resolve that ambiguity "by determining the reasonable expectations of the contracting parties in light of 'the language of any disputed provisions, other provisions, relevant extrinsic evidence, and case law interpreting similar provisions.'"[23] Ambiguities in attorney-client contracts are construed against the attorney.[24]

We begin by determining what reasonable persons in the clients' circumstances would have understood "further substantial litigation" to mean. To do so, we analyze the language of the contract as a whole,[25] turning to non-legal dictionaries to determine "the meaning which the recipient of the communication might reasonably have given" the disputed terms.[26]

The modified fee agreement we must interpret is:

> We will try to obtain a policy limits settlement of your claims. Should we succeed without requiring further substantial litiga-tion we will be paid 1) our out-of-pocket costs and 2) $250,000.
>
> If our efforts at an early settlement do not succeed and it becomes necessary to litigate the matter in a substantive way, we will revert back to our previous written fee agreement and the percentages written there.

The clients do not dispute the court's definitions of "further" or "substantial," but they argue that BPK did not engage in "further substantial litigation" based on the undisputed facts. Thus, the term at the core of this dispute is "litigation," which the modified fee agreement does not define. But the clients and BPK refer us to the same definition: "A lawsuit. Legal action, including all proceedings therein. Contest in a court of law for the purpose of enforcing a right or seeking a remedy. A judicial contest, a judicial controversy, a suit of law." The superior court defined "to litigate" as "to carry on a legal contest by judicial process," and "litigation" as "the process of carrying on a lawsuit" or "a legal proceeding of a civil kind."

These definitions construe "litigation" broadly, as encompassing both the in-court and out-of-court aspects of pursuing a lawsuit and providing legal representation. We conclude that reasonable persons in the clients' circumstances—that is, clients with business

usual resources of contractual interpretation such as the language of the contract, the circumstances in which it was made, and the client's sophistication and experience in retaining and compensating lawyers or the lack thereof"); *id.* § 38 cmt. a (stating that "[a] fee contract must meet the usual requirements of contract law as well as the special rules" governing client-lawyer contracts); *cf. D.N. Corp. v. Hammond*, 685 P.2d 1225, 1231 (Alaska 1984) ("[T]he modification of an existing agreement is governed by the same principles regarding proof and enforceability as the original contract.").

21. *Hartley v. Hartley*, 205 P.3d 342, 347 (Alaska 2009) (quoting *Zito v. Zito*, 969 P.2d 1144, 1147 n. 4 (Alaska 1998)).

22. *Rockstad v. Erikson*, 113 P.3d 1215, 1222 (Alaska 2005) (quoting *McMillan v. Anchorage Cmty. Hosp.*, 646 P.2d 857, 863 (Alaska 1982)).

23. *Hartley*, 205 P.3d at 347 (quoting *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993)).

24. *See* 23 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 62:4 (4th ed. 2002) ("In supervising and interpreting [contingent-fee agreements], the courts are adamant in construing any ambiguity against the attorney who drew the agreement and liberally in favor of the client.").

25. *See Monzingo v. Alaska Air Group, Inc.*, 112 P.3d 655, 660 (Alaska 2005) ("Courts look to the language of the contract as a whole, the objects sought to be accomplished by the contract, the circumstances surrounding its adoption, and case law interpreting its provisions to ascertain the reasonable expectations of the parties." (citing *Craig Taylor Equip. Co. v. Pettibone Corp.*, 659 P.2d 594, 597 (Alaska 1983))).

26. *See Day v. A & G Constr. Co.*, 528 P.2d 440, 445 (Alaska 1974); *see also id.* at 445–47 (turning to a non-legal dictionary to determine the non-technical meaning the contract recipient would have given the contractual term).

acumen[27]—would understand that "litigation" includes not only in-court proceedings and filings, but also the acts necessary to carry out a lawsuit or to pursue legal claims. As the superior court explained, "[a] case doesn't arrive at the courthouse on the day of trial without substantial preparations." The clients' interpretation of the term "litigation" as meaning only in-court appearances and filings is not a reasonable construction of the term.[28]

We are not persuaded by the clients' argument that the parties agreed the thirty-three percent contingency fee would not apply if the case settled before trial. This argument focuses on the phrase "further substantial litigation," without regard to the surrounding provisions. The superior court properly looked to the surrounding contractual provisions, identifying the other relevant terms as "further," "substantial," and "early settlement," and turning to a non-legal dictionary to define those terms.

### c. Extrinsic evidence supports the trial court's interpretation of the fee agreement.

The relevant undisputed extrinsic evidence consists of (1) the clients' August 2005 letter asking BPK to reduce its fees, and (2) BPK's September 2005 letter responding to that request.

The clients asked BPK to agree to a reduced flat fee if a policy limits settlement could be achieved in the early stages of the case, reasoning this would result in "curtail-ment of further legal representation." Their August 2005 letter also says the reduced fee would be justified if settlement occurred because "this eliminates the need for preparation and presentation of a jury trial." These statements reinforce the court's finding that the clients reasonably understood that legal representation includes preparation for trial.

BPK's September 2005 response communicated that it would not agree to a reduced fee if it had to invest significant time and effort to resolve the case. BPK wrote:

> [I]t is likely [the firm] would approve of [the proposed modification] if the firm does not have to expend much more of an investment towards the case. At this point, the expense has been kept to a minimum as no discovery has yet begun. However, if the case continues on, and the firm has to invest more substantial time and expenses, it is unlikely that the firm can accept the 25%.

Given this response, reasonable persons in the clients' position would not have understood that BPK intended to be paid a flat fee if it invested fifteen additional months of time and effort into the case.

Based on this undisputed extrinsic evidence, reasonable persons in the clients' circumstances would understand that they were obligated to pay a thirty-three percent fee even though their attorney did not appear before a court or jury.[29] The language of the modified fee agreement as a whole and the undisputed extrinsic evidence support the court's interpretation.

27. Weiner testified in a deposition that he is the Vice President of Casino Marketing for The Venetian Resort Hotel & Casino in Las Vegas; Garrison stated in a deposition that she is a Casino Marketing Executive for The Venetian.

28. Even if this phrase could be construed as having two interpretations, it would not be ambiguous, as the clients argue, because interpreting "litigation" to include only in-court proceedings and filings is not a reasonable construction of the term. *See Rockstad v. Erikson*, 113 P.3d 1215, 1222 (Alaska 2005). Nor does the parties' disagreement about the interpretation of this phrase render it ambiguous under our case law. *See N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005) ("Dis-agreement between the parties regarding the interpretation of a contract term does not necessarily create ambiguity.") (citing *Wessells v. State, Dep't of Hwys.*, 562 P.2d 1042, 1046 (Alaska 1977)).

29. The clients claim BPK never "disclosed" to them what it meant by the terms "further substantial litigation," specifically that the phrase included work done in preparation for mediation, and that this violated the firm's fiduciary duties. BPK did not expressly define the scope of "further substantial litigation," but its correspondence communicated that it would not agree to a reduced flat fee if it invested substantial time and work on the case.

**3. Viewing the undisputed facts in the light most favorable to the clients, BPK engaged in "further substantial litigation."**

 The clients contend that BPK did not engage in "further substantial litigation" and is not entitled to the thirty-three percent contingency fee because they claim BPK's efforts were toward mediation, not trial.

BPK submitted billing records to show the work it did to prepare for mediation and trial. The clients do not dispute that BPK performed this work; they argue that this work did not qualify as "further substantial litigation." The question presented to us is whether, viewing the undisputed facts in the light most favorable to the clients, the court erred in concluding that BPK engaged in "further substantial litigation." We conclude it did not.

Only substantial work done on the lawsuit after efforts at an "early settlement" failed would entitle BPK to a thirty-three percent contingency fee, so we look to the steps BPK took after it made the initial settlement offer in October 2005 and before settlement occurred in January 2007. In that time, the superior court found that BPK prepared the case for trial and mediation, both of which the trial court found to be "elements of litigation or a legal contest between parties." It reasoned that BPK's preparations for mediation and for trial constituted "substantial litigation" because the efforts were considerable and because litigation includes more than in-court proceedings and filings.

We agree. After the parties modified their fee agreement, BPK attended the depositions of Weiner and Garrison; traveled to Washington to depose Sarp; moved for summary judgment on liability; prepared for and participated in a mediation; hired and interviewed an expert witness on stair construction; met with and talked to physicians; prepared discovery requests and responses;

prepared for and attended an independent medical evaluation in Seattle; researched relevant legal issues; participated in several teleconferences; and generally prepared for trial, including talking to experts on damages and preparing trial exhibits. Based on these undisputed facts, it is clear that BPK engaged in "further substantial litigation" after the early settlement effort failed.

**B. Costs Advanced in the Underlying Lawsuit Were Not at Issue in the Fee–Contract Dispute.**

The clients argue the court erred by concluding that the costs BPK advanced in the underlying lawsuit were not at issue in the fee-contract dispute. They claim they timely raised the issue and that the costs advanced improperly included fees for outside bankruptcy counsel.

The court did not award any costs advanced in the underlying lawsuit. The only costs awarded were those incurred in litigating the dispute over the modified fee agreement. In an oral ruling on the record, the court noted that:

> [N]either party raised the costs being claimed by defendants [in the underlying lawsuit] as at issue in the complaint or answer. [The clients'] counsel argued the costs claimed were the same whether the fees were a flat $250,000 or 33 percent.

The clients raised the issue of costs for the first time in their motion for reconsideration; therefore, they waived this issue.[30] Even if they had raised it in a timely manner, our outcome would not change because the clients asserted in their memoranda and in the superior court hearing that costs were not at issue and that BPK was entitled to them. The court did not err in concluding the issue was not before it.[31]

30. *See Clemensen v. Providence Alaska Med. Ctr.*, 203 P.3d 1148, 1155 (Alaska 2009).

31. In reaching this result we do not mean to condone a contingent-fee attorney treating outside counsel fees as litigation costs payable by the client in the absence of an express agreement by the client. Bar Rule 35(c) requires contingen-

cy fee agreements to be in writing and to state the litigation expenses to be deducted from the recovery. Of course, even an express agreement between an attorney and client must be reasonable, as required by Bar Rule 35(a) and Alaska Rule of Professional Conduct 1.5(c).

### C. The Civil Rule 68 Attorney's Fee Award to BPK Did Not Constitute an Abuse of Discretion.

 The clients argue that the superior court abused its discretion by not reducing BPK's award of attorney's fees under Rule 82(b)(3)(A) (complexity of litigation) and (K) (other equitable factors).[32]

Without addressing whether any fee award should be reduced under Rule 82(b)(3), the court awarded BPK $8,395.95 in attorney's fees under Civil Rule 68,[33] relying on the offers of judgment BPK had timely served on the clients and reasoning that Rule 68 and Rule 82 fee awards cannot be combined.

We review an award of attorney's fees for abuse of discretion.[34] The clients do not challenge BPK's offer of judgment or the court's Rule 68 fee calculation, and the fee award was not manifestly unjust.[35] The court did not abuse its discretion when it awarded fees under Rule 68 without modification.

## V. CONCLUSION

For the above reasons, we AFFIRM the superior court's judgment in all respects.

---

**32.** Civil Rule 82(b)(3) permits a court to vary the prevailing party fee schedules if "the court determines a variation is warranted" based on eleven factors, including "(A) the complexity of the litigation," and "(K) other equitable factors."

**33.** Civil Rule 68(a) states, in pertinent part:
At any time more than 10 days before the trial begins, either the party making a claim or the party defending against a claim may serve upon the adverse party an offer to allow judgment to be entered in complete satisfaction of the claim for the money or property or to the

effect specified in the offer, with costs then accrued.

**34.** *Cook Schuhmann & Groseclose, Inc. v. Brown & Root, Inc.*, 116 P.3d 592, 597 (Alaska 2005).

**35.** *See Rhodes v. Erion*, 189 P.3d 1051, 1054 (Alaska 2008) (holding no abuse of discretion to refuse to reduce a Rule 68 award under Rule 82(b)(3)(K) when appellant failed to meet the "manifestly unjust" standard).