*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PETER ZAMARELLO, | ) | |
| | ) | Supreme Court No. S-14724 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-08-07950 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ROBERT REGES; RUDDY, BRADLEY, | ) | |
| KOLKHORST & REGES, PC; REGES & | ) | No. 6884 - March 28, 2014 |
| & BOONE, LLC, and THE REGES | ) | |
| LAW FIRM, LLC, | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Richard W. Maki and David H. Shoup, Tindall Bennett & Shoup, P.C., Anchorage, for Appellant. Anthony M. Sholty and Lael A. Harrison, Faulkner Banfield, PC, Juneau, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A client sued his lawyer for breach of contract, breach of fiduciary duty, misrepresentation, and professional negligence in a fee agreement dispute. After a jury found in favor of the lawyer and judgment was entered the client appealed, arguing that the superior court erred by issuing certain jury instructions regarding contract

interpretation and by denying the client's motion for a new trial or judgment notwithstanding the verdict. We conclude that any error in the superior court's jury instructions was not prejudicial, and we affirm the superior court's decision to deny the client's post-trial motions because there was sufficient evidence for the jury to find for the lawyer on each of the claims.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Initial contingency fee agreement

Peter Zamarello owned a mobile home park in Anchorage through a company called Alaskan Village, Inc. In December 1999 real estate developer Gerald Neeser obtained an option to purchase a portion of the mobile home park. The Alaska Department of Environmental Conservation (ADEC) subsequently required Zamarello to address contamination on the property. Zamarello met with attorney Robert Reges,[1] who recommended litigation against Zamarello's insurers to obtain remediation funds. Reges prepared a two-page fee agreement dated July 11, 2000. This proposed fee agreement described a contingent hourly fee arrangement, and noted that an adverse party could receive awards of costs and attorney's fees in the event that Zamarello lost a lawsuit. The litigation plan was dropped in favor of a remediation agreement with ADEC, and Zamarello never signed Reges's proposed fee agreement.

In September 2000 a system of underground pipes and tanks was discovered on the property. With potential remediation costs raised significantly by this discovery, Zamarello reverted to a litigation strategy. Reges again presented the July 11 fee agreement; Zamarello asked that it be reduced to a single page due to his limited

---

[1] During the course of his relationship with Zamarello, Reges changed law firms several times but kept Zamarello as a client. We use "Reges" to conveniently denote Reges and his various law firms.

ability to read English. The parties dispute whether Reges's or Zamarello's staff redrafted the agreement, but Zamarello signed it on October 3, 2000. The shortened agreement provided for a contingent hourly fee, but did not include language regarding the potential liability for opposing parties' costs and fees. According to Reges, at an October 4 meeting with Zamarello's in-house attorney present, Reges and Zamarello discussed the July 11 agreement and the potential that Zamarello would be liable to opposing parties if he lost a lawsuit. Reges claims the language in the July 11 agreement was "part of the deal."

In February 2001 Zamarello and Neeser amended their option agreement. Zamarello reduced the purchase price in exchange for Neeser's agreement to pay for the environmental remediation. The parties agreed to jointly pursue claims against potentially responsible parties, with Zamarello receiving the first $3 million recovered plus reimbursement of costs and attorney's fees expended to obtain the recovery. In 2002 Reges filed two lawsuits on Zamarello's behalf — one against Denali Fuel, the company that installed the underground pipes and tanks, and one against 11 insurers alleged to have provided insurance coverage for the environmental contamination.

Although the fee agreement provided for Reges to deduct attorney's fees and costs from recoveries, in practice Zamarello paid Reges's monthly invoices for fees and costs, and Zamarello received the full settlements.

### 2.    Modification of the purchase option

In July 2004 Denali Fuel settled with Zamarello for $1.5 million. Because Neeser was a co-owner of the claims, Denali Fuel insisted that he be a party to the settlement. On July 16 Reges, Zamarello, Zamarello's business manager Paul Gardner, Neeser, Neeser's attorney Donald McClintock, and representatives from Denali Fuel met to obtain Neeser's signature on the settlement. Neeser and Zamarello also discussed how to proceed against the insurers who had not yet settled. Because Zamarello was to

receive the first $3 million of recoveries under the option addendum, and because the total recoveries appeared unlikely to exceed that amount, the parties negotiated an incentive for Neeser to continue with the litigation. After negotiations primarily between Zamarello and Neeser, McClintock wrote an agreement with Reges looking over his shoulder. The resulting agreement modified the February 2001 addendum to the purchase option so that future recoveries would be shared equally between Zamarello and Neeser's assignee, Muldoon Community Improvement, LLC. The agreement also stated in part:

> Out-of-pocket expenses and court costs should be paid by Muldoon Community Improvement, LLC. *Attorney's fees shall be paid for on an hourly contingent fee basis with the law firm of Reges & Boone, LLC who shall be entitled to be paid accrued fees on recoveries as they are received. . . .* Prepaid costs will be paid to Muldoon Community Improvement, LLC from any recovery. (Emphasis added.)

The parties later claimed different subjective understandings of the agreement. Reges understood the modification to provide that from future recoveries Neeser first would be reimbursed for his prepaid costs, followed by payment of Reges's unpaid contingency fees, with the balance of the recoveries divided equally between Neeser and Zamarello. This understanding was echoed by Neeser and McClintock. On the other hand, Zamarello understood the agreement to mean that Neeser would pay all costs and contingency fees out of his share of the recoveries, giving Zamarello half of all gross settlements. Gardner echoed this understanding.

### 3. The final agreement

In August 2004 a dispute arose when Reges presented Zamarello with an environmental consulting company's $9,000 bill that Zamarello did not want to pay. After some discussion, Zamarello agreed to pay the bill as well as a $150,000 bonus that he earlier had offered Reges for getting the Denali Fuel settlement above $1 million.

Reges arranged for two checks from Denali Fuel, one to Zamarello for $1.2 million and one to Reges for $309,000 (including the $150,000 bonus and the consulting company's bill). Reges then made a series of telephone calls to Gardner and McClintock about "shifting the billing" to Neeser.[2] On August 12 Reges drafted a "Final Agreement" which stated in part: "After those payments . . . Zamarello . . . will owe nothing more to [Reges] or his law firms, past or present. Any future work done on the insurance case will be charged to Jerry Neeser."

Again, the parties later claimed to come away with different subjective understandings of this agreement. Zamarello claimed he understood the Final Agreement to mean that, moving forward, he would receive half of any future gross recovery and Neeser would pay all costs and contingency fees for Neeser's half of any gross recovery. Zamarello claimed he understood his previous payments to Reges to be in exchange for a "full release" from future costs and fees. Reges admitted the language was poorly drafted, but claimed he understood the agreement to merely implement the July 16, 2004 purchase option modification by shifting the administration of fee and cost payments to Neeser. Reges believed that costs and attorney's fees would still come from any gross recovery. Reges contended that having future work "charged to" Neeser simply meant that bills would be sent to him.

### 4. The Kemper judgment

Reges continued to prosecute claims against insurers. In 2006 one of the defendants, Kemper Insurance, obtained summary judgment dismissing the claims

---

[2]     In March 2005 Reges and Neeser entered into a fee agreement for the remaining litigation, allowing contingency fees to be "deducted by the firm from the first dollar of any recovery." The agreement provided that "[t]he remainder of any recovery will be divided between . . . [Neeser] and . . . Zamarello as agreed in a separate document dated July 16, 2004."

against it. The court awarded fees and costs to Kemper, resulting in a judgment against Zamarello that Reges negotiated down to $73,000. Zamarello urged Reges to ask Neeser to pay half of the judgment. Reges believed that position had no basis, but nevertheless sent Neeser a letter asking him to contribute to paying the judgment. Neeser did not respond and neither Reges nor Zamarello pursued the matter further. Reges made no deduction from his contingency fees to reflect the Kemper loss.

### 5. End of the insurance litigation

Reges prosecuted and settled the remaining claims in the insurance lawsuit. As settlements came in, Reges repeatedly alerted Zamarello that the money was being used to pay Reges's attorney's fees and Neeser's prepaid costs. Reges continued sending Zamarello billing copies until Zamarello asked him to stop. Zamarello did not raise any objection to this use of the settlement funds. The final balance of the post-July 16, 2004 settlements was $565,000; of that amount, Reges took about $495,000 in attorney's fees and costs and Zamarello and Neeser each received about $35,000.

### B. Proceedings

In 2008 Zamarello filed suit against Reges for breach of contract, breach of fiduciary duty, misrepresentation, and professional negligence. Zamarello sought recovery of: (1) one-half share of the gross recoveries received after July 16, 2004; (2) the $150,000 bonus given in connection with the Final Agreement, which he claimed was breached; (3) the amount paid to satisfy the Kemper judgment; and (4) the payment of contingent hourly fees for litigating against Kemper.

The case was tried to a jury in superior court. At the conclusion of Reges's defense, Zamarello moved for directed verdict. Zamarello argued that the August 2004 Final Agreement unambiguously provided he would owe nothing further and Reges breached the agreement by taking fees and costs and a bonus to which he was not entitled. The court denied the motion. The jury found that Reges did not breach a

contract, did not breach fiduciary duties, and did not make a misrepresentation. The jury found that Reges was negligent, but that the negligence caused Zamarello no damage.

Zamarello timely filed a motion for judgment notwithstanding the verdict (JNOV) or a new trial, reasserting the position raised in his motion for directed verdict. The superior court denied the motion without elaboration. On February 13, 2012 the court entered final judgment in Reges's favor and awarded fees and costs totaling $107,004.26. Zamarello appeals.

## III.   STANDARD OF REVIEW

"In reviewing the superior court's rulings on jury instructions, we apply our independent judgment to determine whether the challenged or refused instruction states the law correctly."[3]  "Errors in jury instructions are not grounds for reversal unless the errors are prejudicial."[4]  "We evaluate whether any error was prejudicial by putting ourselves in the position of the jurors and determining whether the error probably affected their judgment."[5] "The appellant bears the burden of proving prejudicial error."[6]

This court "will affirm a trial court's decision to deny a new trial if there is an evidentiary basis for the jury's decision," and will reverse only if "the evidence supporting the verdict was so completely lacking or slight and unconvincing as to make

---

[3]     *Henrichs v. Chugach Alaska Corp.*, 250 P.3d 531, 535 (Alaska 2011) (quoting *City of Kodiak v. Samaniego*, 83 P.3d 1077, 1082 (Alaska 2004)).

[4]     *Id.* (quoting *State v. Carpenter*, 171 P.3d 41, 54 (Alaska 2007)).

[5]     *Id.* (quoting *City of Kodiak*, 83 P.3d at 1082) (internal quotation marks omitted).

[6]     *Id.* (quoting *City of Kodiak*, 83 P.3d at 1082).

the verdict plainly unreasonable or unjust."[7] "In reviewing orders granting and denying JNOV motions, we must 'determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment of the facts.' "[8] "To the extent that a ruling on a motion for [JNOV] involves questions of law, those questions will be reviewed de novo."[9]

## IV. DISCUSSION

### A. Any Possible Error In The Superior Court's Jury Instructions Was Not Prejudicial.

At trial Zamarello proposed instructing the jury that "[a]mbiguities in attorney-client contracts are construed against the attorney and liberally in favor of the client." The trial court declined to give this instruction, reasoning that ambiguities should be construed against the attorney only when the attorney drafted the contract. Because it was unclear who had drafted the October 2000 contingency fee agreement, the court instead instructed the jury to interpret ambiguous contract terms "against the person who you find drafted the term or provision. . . . If you find that neither party drafted the provision or you are unable to determine which party drafted the provision, then you should disregard this instruction." Zamarello argues that this instruction was erroneous as a matter of law and the error was prejudicial.

---

[7] *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006) (quoting *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001); *Grant v. Stoyer*, 10 P.3d 594, 596 (Alaska 2000)).

[8] *Alaska Interstate Constr., LLC v. Pac. Diversified Invs., Inc.*, 279 P.3d 1156, 1162 (Alaska 2012) (quoting *Richey v. Oen*, 824 P.2d 1371, 1374 (Alaska 1992)).

[9] *Sisters of Providence in Wash. v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 999 n.10 (Alaska 2003).

We first note that ambiguous contracts are construed against a party only "in the absence of other means of ascertaining the reasonable expectations of the parties."[10] The failure to appropriately limit the challenged instruction in this manner actually may have benefitted Zamarello. Given this and the evidence at trial, we conclude that the failure to give Zamarello's proposed instruction, if error, was harmless.

Zamarello first argues that the failure to give his instruction influenced the jury's interpretation of whether the October 2000 contingency fee agreement allowed Reges to collect contingency fees for prosecuting the lost claim against Kemper. The agreement states that "[p]ayment of fees is contingent upon recovery. No recovery, no fee." But the evidence was clear that throughout the course of the single case against the 11 insurers the parties treated all of the claims as one matter and used proceeds from settlements with one insurer towards fees and costs of litigation with other insurers. The jury probably did not rely on the challenged instruction in the face of this extrinsic evidence.

Zamarello next argues that the July 16, 2004 modification of the purchase option between Zamarello and Neeser was ambiguous as to whose share of the recoveries Reges was allowed to collect fees from and the ambiguity should have been resolved in Zamarello's favor. But Zamarello's proposed jury instruction stated only that "[a]mbiguities in *attorney-client contracts* are construed against the attorney." (Emphasis added.) Although the modification agreement clarified the relationship between Zamarello and Reges and Reges helped draft it, it was not an agreement between an

---

[10]     *Cook v. Cook*, 249 P.3d 1070, 1078 (Alaska 2011) (quoting *Monzingo v. Alaska Air Grp., Inc*., 112 P.3d 655, 661 n.29 (Alaska 2005)); *see also DeCristofaro v. Sec. Nat'l Bank*, 664 P.2d 167, 169 (Alaska 1983) ("[I]n the absence of other means of ascertaining the reasonable expectations of the parties, we have held that ambiguities in contractual language are to be construed against the drafter.").

attorney and a client, but rather an agreement between Zamarello and Neeser. Reges did not negotiate the modification agreement nor did he sign it. The failure to give Zamarello's proposed instruction therefore was irrelevant to this issue.

Finally, because Reges was both the drafter and the attorney, the choice of instruction unlikely had any prejudicial effect on the jury's interpretation of the Final Agreement.

Based on the foregoing, we conclude that any possible error in the jury instructions was not prejudicial. We therefore do not reach the question whether the court correctly stated the law in the jury instruction.

B. **The Superior Court Did Not Err By Denying The Motion For JNOV Or New Trial Respecting Zamarello's Claim For Half Of The Post-July 2004 Settlements.**

Zamarello argues the August 2004 Final Agreement's plain language that he "will owe nothing more to [Reges] or his law firms [and] [a]ny future work . . . will be charged to . . . Neeser" unambiguously ended the contingency fee arrangement and the court should have interpreted it as a matter of law. He argues that extrinsic evidence is irrelevant because the contract is not reasonably susceptible to Reges's interpretation that the language merely shifts the billing to Neeser. He also argues that any potential ambiguities should be interpreted against the attorney and in favor of the client. Reges counters that extrinsic evidence may always be considered to determine whether a contract is ambiguous and that the extrinsic evidence gave the jury an evidentiary basis to find the Final Agreement did not end the contingency fee agreement.

"The goal of contract interpretation is to give effect to the parties' reasonable expectations . . . [which] must be gleaned not only from the contract language, but also from extrinsic evidence, including evidence of the parties' conduct, goals sought to be accomplished, and surrounding circumstances when the contract was

negotiated."[11] "Typically, in resolving disputes concerning . . . an agreement, we begin by viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms, in order to determine if those terms are ambiguous — that is, if they are reasonably subject to differing interpretation, and if those differing interpretations are both reasonable."[12] "[I]nterpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning."[13] Here, although the language of the contract could lend itself to Zamarello's interpretation, it also could lend itself to Reges's interpretation, allowing the jury to decide for Reges.

First, the July 2004 modification agreement of the purchase option, executed by Zamarello only a month prior to the Final Agreement, provided for Reges to collect his contingency fees from recoveries as received and stated that the remaining recoveries were to be shared equally between Neeser and Zamarello. The modification agreement specifies other fees and costs for which each party was responsible, but lacks any explicit statement that attorney's fees were to be paid only out of Neeser's share of the recovery. Both Neeser and McClintock testified that they understood the

---

[11]    *Miller v. Handle Constr. Co.*, 255 P.3d 984, 988-89 (Alaska 2011) (citations and internal quotation marks omitted).

[12]    *Weiner v. Burr, Pease & Kurtz, P.C.*, 221 P.3d 1, 9 (Alaska 2009) (citations, alterations, and internal quotation marks omitted).

[13]    *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) (quoting *Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997)) (internal quotation marks omitted). *See AAA Valley Gravel, Inc. v. Totaro*, 219 P.3d 153, 161 (Alaska 2009) ("Contract interpretation involves fact-finding when facially ambiguous contract language read in the context of all relevant extrinsic evidence remains ambiguous . . . .").

modification agreement to mean that Reges would take his fees off the top of all recoveries. The only person to echo Zamarello's interpretation of the modification agreement was his business manager, who did not take part in the negotiation.

Second, the parties' course of conduct could be seen to support Reges's interpretation. Although the initial October 2000 contingency fee agreement provided that fees would be collected "from the 'first dollar' of any recovery," in practice Zamarello was paying monthly invoices to Reges for costs and fees. In February 2002 Zamarello agreed to pay $5,000 monthly on the fees and costs as they were accruing, to be credited against Reges's eventual recovery on contingency. This arrangement supports the idea that Zamarello became tired of handling the billing and making monthly payments and therefore the Final Agreement merely shifted this responsibility to Neeser. This arrangement also is consistent with the August 2004 Final Agreement language that Zamarello would "owe nothing more" and that future work would be "charged to Jerry Neeser."

Third, the negotiations surrounding the August 2004 Final Agreement could be seen to support Reges's interpretation. The Final Agreement was made in the context of a dispute over a $9,000 bill for litigation costs. After a discussion in which Zamarello threatened that if he had to pay the full invoice he would tarnish Reges's reputation, Zamarello agreed that Reges could receive the full amount owed (for both the $9,000 cost item and the Denali Fuel bonus) in exchange for a "full release." This threat suggests the parties already were on bad terms, and it may have been important to Zamarello that he stop interacting with Reges directly and that billing and payment for the litigation go through Neeser. Also, the day before the Final Agreement, Reges made a series of telephone calls to Zamarello, Gardner, and McClintock about "shifting the billing" to Neeser.

Fourth, Reges's subsequent fee agreement with Neeser provided for contingency fees from both Neeser's and Zamarello's recovery, consistent with the July 16, 2004 modification agreement. That fee agreement stated that contingency fees would come "from the first dollar of any recovery" with the remainder split "as agreed in [the modification agreement]." Reges testified that he told Zamarello about the agreement and Zamarello did not object. The fee agreement was retroactive to the date of the modification agreement, implying that the parties believed the agreement echoed the provisions of the modification agreement. This reinforces the interpretation that Reges was entitled to collect fees from gross recoveries.

Fifth, Zamarello failed to object when Reges repeatedly informed him that Reges's attorney's fees were being paid from incoming settlements after the Final Agreement. The first settlement in the insurance litigation was $22,500 in November 2004. Reges informed Zamarello of the settlement and his intention to apply the recovery to costs and fees. Zamarello did not object to this division, and instead told Reges that further bills should be directed to Neeser. On March 2, 2006, Reges advised Zamarello of a $130,000 settlement and stated that he was drawing on the funds to pay for costs and his fees. On March 14 Reges again informed Zamarello that he was receiving settlements and using the money to pay himself fees. On March 24 Reges made a telephone call to Zamarello in which they discussed "getting dollars from insurers . . . and who gets to keep the settlements." On March 25 Reges sent Zamarello a letter reiterating that fees were to be deducted from the first dollar of recoveries and stating: "I am paying myself from the monies now being recovered from settling insurers." On April 4 Reges sent a fax informing Zamarello of settlements totaling $227,500 and of Reges's intent to pay himself $150,000 and use the rest to finance the trial. On May 17 and June 29, Reges sent Zamarello breakdowns of expenditures showing that recoveries were applied first to costs and fees with the remainder being split

evenly between Neeser and Zamarello. Zamarello did not object to any of these statements and did not object when Reges stayed with him for a week and "talked to him about all of this in detail." Zamarello's failure to object implies contemporaneous agreement to the arrangement.

Finally, under Zamarello's interpretation, either all fees would have come out of Neeser's recovery or Reges would have had to work for half his usual rate. Reges did not have the authority to make that agreement for Neeser without his consent, and it seems unlikely that Reges would agree to charge Neeser the full attorney's fees without first approaching Neeser about the new arrangement. Nor is there any evidence that Reges agreed to protracted litigation at half his usual rate in exchange for payment of money he felt he was already owed.

In contrast, Reges's interpretation mirrors the parties' actual relationship, with Reges working to pursue Zamarello's claims and being paid from recoveries. Zamarello argues that any ambiguity should be construed against the attorney,[14] but we again note that rules interpreting contracts against the drafter should be applied only "in the absence of other means of ascertaining the reasonable expectations of the parties."[15] Because Zamarello is challenging the jury's determination that the August 2004 Final Agreement did not end the contingency fee arrangement, we ask only whether there was an evidentiary basis for that determination.[16]

Reges's wording in the August 2004 Final Agreement that Zamarello will

---

[14]     *See Weiner*, 221 P.3d at 9.

[15]     *Cook*, 249 P.3d at 1078 (quoting *Monzingo*, 112 P.3d at 661 n.29); *see also DeCristofaro*, 664 P.2d at 169 (Alaska 1983).

[16]     *Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006) (quoting *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001); *Grant v. Stoyer*, 10 P.3d 594, 596 (Alaska 2000)).

"owe nothing more" and further work will be "charged to" Neeser could be misleading, but Reges's interpretation is not precluded as a matter of law.[17]  Reges also testified at times that he intended the Final Agreement to end Zamarello's obligation to pay attorney's fees but that he was nonetheless entitled to take fees from the top of all recoveries.[18]  "It is the jury, not the court, which . . . . weighs the contradictory evidence and inferences, judges the credibility of witnesses . . . and draws the ultimate conclusion as to the facts."[19]  The jury had an evidentiary basis for its decision, and under our deferential standard of review, we affirm the trial court's denial of Zamarello's motion for JNOV or a new trial on his claim for half of the post-July 2004 recoveries.

C.     **The Superior Court Did Not Err By Denying Zamarello's Motion For A New Trial Based On His Claim For Reimbursement For The Kemper Fee.**

Zamarello raises three arguments for reimbursement of his payment of Kemper's adverse fees and costs award.  He first argues that Reges violated Alaska Rule of Professional Conduct 1.5(b) by not notifying him in the written fee agreement that he might be liable for the opposing party's costs, fees, or expenses, and that this omission

---

[17]     *See Little Susitna Constr.*, 944 P.2d at 25 (holding contract interpretation properly submitted to jury where term had no settled legal definition).

[18]     Reges argues in the alternative that Zamarello was not paying contingency fees because Reges was collecting fees directly from the insurers — in effect stating that a client does not pay contingency fees.  This argument is incorrect as a matter of law.  Clients contract with attorneys to pay contingency fees.  *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 35 (2000) ("A lawyer may contract with a client for a fee the size or payment of which is contingent on the outcome of a matter . . . .").  Recoveries are held in trust for the client and paid to the attorney out of the client's trust account.  *See* Alaska R. Prof. Conduct 1.15.

[19]     *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 n.2 (Alaska 1983) (quoting *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944)).

prevents Reges from requiring him to pay the Kemper fee. Reges argues that he advised Zamarello of the risk of adverse judgment in the two-page July 11, 2000 contingency fee document, through discussions with Zamarello's in-house counsel after the October 2000, agreement, and during the July 16, 2004 modification agreement discussion. Zamarello counters that he never signed the July 11, 2000 agreement and that the writing requirement cannot be avoided by claiming that the client otherwise knew of the terms of the representation.[20] But under the parol evidence rule, unless the contract is fully integrated, contract terms may be supplemented by extrinsic evidence of consistent additional terms.[21] Here, the October 3, 2000 agreement did not contain an integration clause,[22] and Zamarello makes no argument that it otherwise was an integrated agreement. Although the non-integrated, signed fee agreement did not contain the required written warning, the jury had an evidentiary basis for finding that the written warning in the July 11, 2000 document was part of the October 2000 fee agreement.

Zamarello next argues that even if the July 11, 2000 document were part of the agreement, the language was inadequate to warn him of the Kemper judgment risk because the document addressed what happens "if this matter is taken to trial" and the Kemper fees were awarded on summary judgment. Zamarello points to the Alaska Comment section of Professional Rule 1.5(b) approving the phrasing "if you don't win

---

[20] *See Statewide Grievance Comm. v. Dixon*, 772 A.2d 160, 164 (Conn. App. 2001).

[21] *Froines v. Valdez Fisheries Dev. Ass'n*, 75 P.3d 83, 86-87 (Alaska 2003) (quoting AS 45.02.202(2)); *see also* RESTATEMENT (SECOND) OF CONTRACTS §§ 215, 216(1) (1981).

[22] *See, e.g.*, *Nautilus Marine Enters. v. Valdez Fisheries Dev. Ass'n*, 943 P.2d 1201, 1204 n.5 (Alaska 1997) (describing an integration clause stating: "This instrument is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of its terms.").

your case,"[23] arguing it was error to not include this language. But Zamarello forfeited this argument by raising it for the first time on appeal.[24] And because the comments on the Professional Rules are meant as guides to interpretation, any deviation from language approved in the comments does not necessarily equate to a violation of the rules.[25]

Finally, Zamarello claims that Reges abdicated his professional responsibility to Zamarello by not pursuing Neeser for half of the Kemper costs. But during the 2004 modification agreement discussions the parties agreed to not add Neeser as a plaintiff partly because of the risk of adverse judgment. Reges pursued the matter to an appropriate degree by writing Neeser a letter requesting payment of half the judgment even though he believed Neeser had no obligation to pay. The jury had an evidentiary basis for determining that Zamarello was not entitled to reimbursement for the Kemper fee, and we therefore affirm the trial court's denial of his motion for a new trial based on this claim.

**D.    The Superior Court Did Not Err By Denying Zamarello's Motion For JNOV Or A New Trial Regarding His Claim For The $150,000 Bonus.**

Zamarello raises several arguments why he is entitled to repayment of the $150,000 bonus given to Reges for the Denali Fuel settlement. Zamarello first argues that the bonus was consideration for the August 2004 Final Agreement, which ended his obligation to pay contingency fees. Zamarello contends that Reges breached the agreement by taking contingency fees from the recoveries, entitling Zamarello to recover

---

[23]    Alaska R. Prof. Conduct 1.5, Alaska Comment.

[24]    *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001) ("A party may not raise an issue for the first time on appeal.").

[25]    *See* Alaska R. Prof. Conduct, Scope ("The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation . . . . The COMMENTS are intended as guides to interpretation . . . .").

the $150,000. But the jury had sufficient evidence from Reges's testimony to conclude that the bonus was given in exchange for work done on the Denali Fuel settlement, not in consideration for a release from fees. The jury therefore had an evidentiary basis to find the bonus was not given as consideration for the release.

Zamarello also argues that Reges intentionally misrepresented his intentions to continue taking contingency fees when he drafted the Final Agreement and that this entitles Zamarello to recover the $150,000. But intentional misrepresentation requires an intent to deceive,[26] and the jury could have relied on Reges's testimony that the Final Agreement was quickly and poorly drafted to find that there was no intentional misrepresentation.

Finally, Zamarello argues that the $150,000 was given in exchange for Reges getting the Denali Fuel settlement above $1 million, making the payment a contingency fee and therefore invalid under Alaska Professional Rule 1.5(c) which requires contingency fee agreements to be in writing. Zamarello forfeited this argument by failing to raise it at trial or in his motion for JNOV or a new trial.[27] We therefore affirm the trial court's denial of Zamarello's motions for JNOV or a new trial based on his claim for reimbursement of the $150,000 bonus.

## V.    CONCLUSION

Based on the foregoing, we AFFIRM the superior court's judgment.

---

[26]    *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 221 P.3d 977, 987-88 (Alaska 2009) (quoting *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Corp.*, 129 P.3d 905, 914 (Alaska 2006)).

[27]    *See Brandon*, 28 P.3d at 280 ("A party may not raise an issue for the first time on appeal. And cursory treatment of an issue is considered by this court to be waiver of that issue.") (citations omitted); *Padgett v. Theus*, 484 P.2d 697, 700 (Alaska 1971) ("Ordinarily an issue which was not raised in the trial court will not be treated on appeal.").