*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| COOPER LEASING, LLC, | ) | |
| | ) | Supreme Court Nos. S-18284/18293 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 3AN-18-09686 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| WORONZOF CONDOMINIUM | ) | No. 7700 – May 17, 2024 |
| ASSOCIATION, | ) | |
| | ) | |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Adolf V. Zeman, Judge.

Appearances: Brent R. Cole and Debra J. Fitzgerald, Law Office of Brent R. Cole, P.C., Anchorage, for Appellant and Cross-Appellee. Ralph B. Cushman, McCollum & Rounds, LLC, Anchorage, for Appellee and Cross-Appellant.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

BORGHESAN, Justice.

## I.    INTRODUCTION

This appeal stems from a dispute between a condominium association and the owner of two commercial units over parking and storage space. The superior court ruled that the condominium's governing documents did not give the commercial owner

ownership of any parking spots. But the court ruled in the commercial owner's favor on the storage dispute. It found that the association had agreed decades earlier to swap the condominium's general storage area with the area designated for commercial storage. The court estopped the association from reneging on the swap. The commercial owner appealed the ruling on parking, and the association cross-appealed the ruling on storage.

We affirm the ruling on parking. The terms of the declaration, in light of relevant extrinsic evidence, are ambiguous as to whether it was intended to give the commercial units the exclusive rights to use certain parking spots. The superior court did not clearly err in resolving the ambiguity in favor of the association.

But we vacate the ruling on storage. Owners of condominiums have a property interest in both their own units and in the common areas of the condominium. These interests are recorded, like other interests in real property. There is a special test for when the doctrine of quasi-estoppel can be used to defeat record title to real property. Because this test was not applied to the commercial owner's quasi-estoppel claim to the storage space, we vacate and remand for further proceedings.

## II. FACTS AND PROCEEDINGS

### A. Law Governing Condominiums

This case turns on the interpretation of a condominium's governing documents, as well as rules about common areas, limited common areas, and how rights in these areas can be altered. The commercial owner argues that certain parking spots are limited common areas reserved for its exclusive use. It also argues that it is entitled to exclusive use of the general storage area after a swap of storage spaces. Therefore we begin by describing some of these concepts and the rules that apply to them.

Generally speaking, a condominium is "[a] single real-estate unit in a multi-unit development in which a person has both separate ownership of a unit and a

common interest, along with the development's other owners, in the common areas."[1] A common area is "[a]n area owned and used in common by the residents of a condominium."[2]

In Alaska, condominiums created before 1986 are governed by the Horizontal Property Regimes Act (HPRA).[3] Legal rights in a condominium are established by a properly recorded declaration.[4] The declaration is essentially the "constitution" of a condominium[5] that identifies each owner's interest in the property, permissible uses, common areas, procedures for establishing and amending bylaws, and other provisions essential to rights and governance.[6] The declaration must contain a description of the condominium's common areas and facilities and "limited common areas and facilities, if any, stating to which apartment their use is reserved."[7] "Each apartment owner is entitled to an undivided interest in the common areas and facilities

---

[1] *Condominium*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[2] *Common Area*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also* AS 34.07.160(b).

[3] *See* AS 34.07.010-.460. In 1985 the Legislature enacted the Common Interest Ownership Act to govern condominiums created after January 1, 1986. Ch. 95, §§ 1-4, SLA 1985 (codified as AS 34.08.010-.995); *see also* AS 34.08.010. Condominiums created before that date continue to be governed by the HPRA, except as specifically stated in the Common Interest Ownership Act. AS 34.08.040. Because the condominium at issue in this case was built before 1986, this dispute is governed by the HPRA.

[4] AS 34.07.010-.020.

[5] *O'Buck v. Cottonwood Vill. Condo. Ass'n*, 750 P.2d 813, 815 (Alaska 1988) (citing AS 34.07.010-.070).

[6] AS 34.07.020.

[7] AS 34.07.020(4)-(5).

in the percentage expressed in the declaration."[8] "Limited common areas," by contrast, are "those common areas and facilities designated in the recorded declaration, as reserved for use of certain apartment or apartments to the exclusion of the other apartments."[9]

The declaration must be recorded; so too must any amendments to the declaration.[10] There must also be, recorded simultaneously with the declaration, a "survey map of the surface of the land" and a "set of the floor plans of the building showing the layout."[11]

With these concepts in mind, we turn to the facts of this case.

## B. Origins Of The Dispute

Cooper Leasing, founded by Ron Cooper, is a company that owns and manages properties, including two commercial units in the Woronzof Condominium Building (the Building). The Building is a seven-story mixed-use structure that was constructed in Anchorage in the late 1970s and early 1980s. Construction of the Building was funded, organized, and often performed by the Tower Partnership, a group of Anchorage businesspeople that included Ron Cooper.

The first floor of the Building consists of two commercial units and common areas providing access to the remaining floors. The second floor initially consisted of residential units, but over time all but one of those residential units have been converted to commercial units. The remaining floors contain residential units only. The basement contains storage spaces and maintenance areas.

---

[8] AS 34.07.160(b); *see also* AS 34.07.450(6) (defining "[c]ommon areas and facilities" to include parking areas and storage spaces, but also the land, stairs, elevators, utility installations, and fire escapes, among other things).

[9] AS 34.07.450(11).

[10] AS 34.07.010(b).

[11] AS 34.07.030(1)-(2).

The Building is managed by the Woronzof Condominium Association (the Association). Ron Cooper, and later his son Jeff Cooper, sat on the board of the Association for many of the years since the Building's construction.[12] Although the Association manages the common areas in the Building, it does not have an ownership interest in any portion of the Building. Each unit is privately owned, and each owner has a fractional undivided interest in all common areas described in the condominium declaration. The Association is comprised of all condominium unit owners, each having voting power based on the square footage of their holdings.

As portions of the Building were completed, the Tower Partnership sold them to its members. Initially, Ron Cooper believed that the two first-floor commercial units were sold to another member of the Tower Partnership, Paul Skoglund. Skoglund then sold the units to Cooper Leasing via quitclaim deed in 1983. However, Cooper Leasing later discovered that there was no record of the Tower Partnership conveying the units to Skoglund. In 1984 the Tower Partnership issued Cooper Leasing a warranty deed for the two ground-floor commercial units.

A recorded survey map (pictured below),[13] shows 48 parking spaces. On the north side of the Building, 35 spaces are assigned to specific units and are labeled "A," "B," and "C." On the south side, 10 parking spaces are labeled "Public Parking."

---

[12]    Testimony was given that at least one of the Coopers was on the board for 19 of the first 32 years for which there are records.

[13]    The recorded survey map is also referred to as the "plot plan" in the record and briefing.



The filed plans also map out the basement of the Building, labeling the northeast corner as "Commercial Storage" and the northwest corner as "General Bldg. Storage."



The present dispute over parking and storage space erupted in 2016. For the previous 30 years, Cooper Leasing's units had enjoyed exclusive use of the 10 parking spaces south of the Building (labeled "Public Parking" on the survey map above) on Mondays through Fridays from 8:00 a.m. to 6:00 p.m. For at least the previous 30 years, Cooper Leasing had also enjoyed exclusive use of the northwest basement storage space (labeled "General Bldg. Storage" on the floor plan shown above), after the Association agreed to swap this storage area with the area designated "Commercial Storage."

But in 2016 the Association decided to rent out the parking spaces south of the Building that Cooper Leasing had been using. It also decided that Cooper Leasing should be paying rent for the northwest basement storage areas it was using. Cooper Leasing paid this rent under protest.

### C. The Litigation

In 2018 the Association filed a complaint against Cooper Leasing seeking to quiet title to parking spaces and the disputed storage areas.

Cooper Leasing answered and counterclaimed, appearing to allege that it was the "rightful possessor" of the general building storage area (in the northwest corner) and that there was an "understanding" that Cooper Leasing was entitled to certain parking spaces "in front of [the] building." Cooper Leasing relied upon the historical documents and the parties' conduct for the past 30 years to support its allegations that it was entitled to the exclusive use of the general building storage area (in the northwest corner) and the "parking spaces in front of [the] building."

Roughly a year and a half later, the Association filed an amended complaint. The Association conceded in this complaint that Cooper Leasing owned the northeast storage space (i.e., the "commercial storage"). However, the Association now alleged that Cooper Leasing improperly swapped this space for the northwest storage space in the basement. Cooper Leasing's amended response maintained that it owned the northwest basement space and 18 parking spaces as its limited common areas.

At trial both parties acknowledged that none of the individuals or entities involved kept good records and that many of the witnesses with direct knowledge of relevant events were either deceased, incapacitated, or did not remember these events due to the passage of time. The evidentiary record was therefore incomplete.

On parking, Cooper Leasing argued that the declaration set aside 18, or at the very least 10, parking spots as limited common areas for the exclusive use of its commercial units. It acknowledged that the language of the declaration itself was ambiguous. Yet it highlighted several pieces of extrinsic evidence supporting its interpretation: the parking layout shown in a "site plan" of the Building prepared in 1977, before the declaration was recorded; a municipal ordinance in effect at the time that required the Building to have 18 commercial parking spaces based on the square footage of the commercial units; and evidence of the parties' conduct, including the fact

that the Association allowed Cooper Leasing to have exclusive use of the 10 south-side parking spots during business hours. The Association argued that the declaration was not ambiguous and that it could not reasonably be read to grant any limited common area parking to the commercial units, notwithstanding the extrinsic evidence.

On storage, Cooper Leasing argued that the parties agreed to swap storage spaces in 1984. It argued that the court should enforce the swap, even though it was not recorded as required by the HPRA, under various equitable doctrines such as equitable estoppel, quasi-estoppel, and quasi-contract. The Association argued that the swap of storage spaces was unlawful because it was not approved in the manner required by the declaration or the HPRA and that Cooper Leasing's equitable doctrines could not be applied to defeat the HPRA's requirements.

### D.    The Superior Court's Ruling

The superior court ruled in the Association's favor on parking and in Cooper Leasing's favor on storage.

On parking, the court determined that the declaration was not intended to grant the commercial units either 18 or 10 limited common area parking spots for the units' exclusive use. It reasoned that the language of the declaration and the associated documents did not expressly designate any parking spots as the limited common area of the commercial units. The court also ruled that the municipal parking ordinance required a certain number of spots based on the square footage of the commercial units, but did not require those spots to be reserved for the exclusive use of the commercial units.[14]

The court also found that the parties' conduct did not support the conclusion that the parking spots in question were the limited common areas of the commercial units. For example, the court recognized that so-called "House Rules"

---

[14]    *See* Former Anchorage Municipal Code (AMC) 21.45.080 (1978).

adopted in 2001 gave the commercial units exclusive use of the 10 south-side parking spaces from 8:00 a.m. to 6:00 p.m. But it concluded that enforcing exclusive use of these spots for certain periods of time was not equivalent to establishing these spots as the exclusive property of the commercial units. Additionally, the court observed that there were some attempts to amend the declaration to clearly provide the commercial units with limited common area parking, but it was not clear whether those amendments were adopted, and they were never recorded. Ultimately, the court rejected Cooper Leasing's claim to any limited common area parking spots.

On storage, the superior court ruled that Cooper Leasing had a limited common area interest in the northwest storage space under the doctrine of quasi-estoppel.[15] The court found that the storage area labeled "Commercial Storage" had originally been Cooper Leasing's limited common area, and that Cooper Leasing and the Association "entered into an enforceable agreement to swap" this storage space for the Building's general storage area. The court reasoned that even though the HPRA requires amendments to ownership interest in common areas to be approved by a certain percentage of unit owners and recorded,[16] it would be "unconscionable" to allow the Association to now take the position that the swap was not enforceable.

Cooper Leasing appeals the superior court's ruling that it has no limited common area parking. The Association cross-appeals the ruling that it is estopped from denying there was an enforceable swap of basement storage spaces.

## III. STANDARDS OF REVIEW

We have previously described a condominium declaration as a contract that defines the rights and title of unit owners, and we have applied contract

---

**15** Quasi-estoppel is an equitable doctrine that "preclud[es] a party from taking a position so inconsistent with one he has previously taken that circumstances render assertion of the second position unconscionable." *Rockstad v. Erikson*, 113 P.3d 1215, 1223 (Alaska 2005).

**16** AS 34.07.020(13)-.010(b).

interpretation principles to resolve disputes over the meaning of a declaration's terms.[17] The superior court applied contract principles to interpret the declaration's terms on parking. Neither party has argued that the superior court erred in doing so, and both parties urge us to apply contract principles to resolve this dispute on appeal. We therefore accept this framework to resolve the case.[18]

"The goal of contract interpretation 'is to give effect to the reasonable expectations of the parties.' "[19] To determine the parties' reasonable expectations, "the court looks to the language of [a] disputed provision, the language of other provisions

---

[17] *Black v. Whitestone Ests. Condo. Homeowners' Ass'n*, 446 P.3d 786, 791 (Alaska 2019) (treating condominium declaration as contract); *see also* 15B AM. JUR. 2D *Condominiums, Etc.* § 40 (2024) ("Condominium declarations of covenants, conditions, and restrictions are interpreted according to the usual rules for the interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties.").

[18] In *Black v. Whitestone Estates*, we applied contract interpretation rules to interpret provisions of a declaration involving the payment of dues, noting that both parties agreed with this approach. 446 P.3d at 791 n.4. However, some provisions of a declaration arguably operate like a deed to real property, both as to the unit itself and the owner's interest in common areas and limited common areas. *See* AS 34.07.020 (providing that a "declaration must contain (1) a description of the land on which the building and improvement are or are to be located; . . . (3) . . . data necessary for [the apartment's] proper identification; (4) a description of the common areas and facilities; (5) a description of the limited common areas and facilities, if any, stating to which apartment their use is reserved").

When we interpret a deed, we use a different interpretive approach: We do not consider extrinsic evidence unless the language of the deed, considered alone, is ambiguous. *Est. of Smith v. Spinelli*, 216 P.3d 524, 529-33 (Alaska 2009). We need not decide whether that is a more appropriate approach to interpreting the terms of a declaration defining interests in condominium property because, as we describe below, the language of the declaration itself is ambiguous as to whether it reserved 10 parking spots as limited common area of the commercial units.

[19] *Seal v. Welty*, 477 P.3d 613, 622 (Alaska 2020) (quoting *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981)).

of the contract, relevant extrinsic evidence, and case law interpreting similar provisions."[20]

Contract interpretation begins as (and often remains) a question of law.[21] A court may consider " 'extrinsic evidence surrounding disputed terms,' . . . to determine if those terms are ambiguous — that is, if they 'are reasonably subject to differing interpretation.' "[22] Whether the terms are ambiguous is a question of law that we review de novo.[23] But "[i]nterpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning."[24]

The parties recite standards of review without explaining how they should apply in this case. They do not clearly state whether the superior court's interpretation of the declaration should be reviewed ultimately as a question of law or a question of fact. It appears to us that the court ultimately made a factual finding about the intent of the declaration after examining the language of the declaration and associated documents as well as extrinsic documentary and testimonial evidence about the parties' purpose and conduct. This approach was correct because, as we explain below, the terms of the declaration concerning parking were reasonably susceptible to different

---

[20]    *Id.* (alteration in original).

[21]    *See id.* at 618.

[22]    *Id.* at 622 (alteration in original) (quoting *Zito v. Zito*, 969 P.2d 1144, 1147 n.4 (Alaska 1998)).

[23]    *Est. of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007) ("The question of the meaning of a written contract, including a review of the extrinsic evidence to determine whether any of the extrinsic evidence is conflicting, is a legal question which we review de novo.").

[24]    *Zamarello v. Reges*, 321 P.3d 387, 394 (Alaska 2014) (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004)).

interpretations. Therefore, we review the superior court's ultimate finding that the declaration was not intended to reserve any exclusive parking for the commercial units for clear error. "A finding of fact is clearly erroneous if it leaves the court with a 'definite and firm conviction on the entire record that a mistake has been made.' "[25]

We review de novo whether the superior court correctly applied the law of quasi-estoppel.[26] If the court applies the law correctly, its determination that quasi-estoppel should or should not apply will not be reversed unless the factual findings on which it is based are clearly erroneous.[27]

## IV. DISCUSSION

### A. We Affirm The Superior Court's Rulings Denying Cooper Leasing's Claim To Exclusive Ownership Of Parking Spots.

Cooper Leasing argues that it was intended, when the Building was created, that the commercial units it owns would have parking spots for their exclusive use — in other words, that they were granted limited common area parking spots. Cooper Leasing presents alternative theories. First, it argues that the intent of the declaration was to reserve for the commercial units' exclusive use 18 parking spots, the number of parking spots the commercial units' square footage would have required under municipal ordinance then in effect. Second, and in the alternative, it argues that it was the intent of the declaration to reserve the 10 parking spaces on the south side of the Building labeled "Public Parking" as the commercial units' limited common area parking. Third, it argues that it is entitled to exclusive ownership of 10 parking spots under the doctrines of equitable estoppel and quasi-estoppel.

---

[25] *N. Pac. Processors, Inc. v. City & Borough of Yakutat*, 113 P.3d 575, 579 (Alaska 2005) (quoting *Dunn v. Dunn*, 952 P.2d 268, 270 (Alaska 1998)).

[26] *See Dressel v. Weeks*, 779 P.2d 324, 332-33 (Alaska 1989) (establishing rule of law for when doctrine of quasi-estoppel may be applied to defeat record title).

[27] *Rockstad v. Erikson*, 113 P.3d 1215, 1223 (Alaska 2005) (citing *Jamison v. Consol. Utils., Inc.*, 576 P.2d 97, 102 (Alaska 1978)).

These arguments rest heavily on the idea that a condominium declaration dedicating some units to commercial use should be interpreted to reserve parking for the exclusive use of commercial unit owners. Specifically, Cooper Leasing argues that the superior court's ruling is "logically absurd" because "[i]t defies reason that anyone would buy or own a commercial condominium unit that . . . has no off-street parking for its employees and commercial customers." "With no limited common area parking for the commercial units," Cooper Leasing argues, "the customers would have to compete with the residential unit owners and their guests for the south-side parking spaces on a first come, first serve basis."

Cooper Leasing's argument for 18 exclusive parking spots is not persuasive, but its argument for 10 spots presents a close call. Looking at the declaration and the extrinsic evidence presented, the 10 spots labeled "Public Parking" could reasonably be interpreted as reserved for the exclusive use of the commercial units or as left open for use by members of the broader "public," which includes not only those associated with the commercial units but also guests of the residential unit owners. Because the declaration is ambiguous on this point, determining its intent became a "task for the trier of fact."[28] We cannot say that the superior court clearly erred in finding that the declaration was not intended to reserve any limited common area parking for the commercial units. Finally, we affirm the superior court's rejection of Cooper Leasing's arguments that the Association should be estopped from denying its exclusive right to parking spots.

---

[28] *Zamarello*, 321 P.3d at 394.

**1. The declaration cannot plausibly be interpreted to reserve eighteen limited common area parking spots for the commercial units.**

The declaration, considered together with extrinsic evidence, cannot be reasonably interpreted to reserve 18 limited common area parking spots to the commercial units.

A condominium's "declaration must contain . . . a description of the limited common areas and facilities, if any, stating to which apartment their use is reserved."[29] The Building's declaration states that limited common areas are "set forth on the survey map and/or the set of floor plans filed simultaneously herewith" and "are described in Exhibit B." Exhibit B is a list entitled "Description of Limited Common Areas and Facilities." The list describes one parking spot and one storage space as the limited common area of each residential unit, but it does not mention the commercial units at all. In this respect Exhibit B contrasts with Exhibit A, which is entitled "Description of Units" and includes a description of each commercial unit as well as each residential unit.

Exhibit B states that its description of limited common areas is "also shown on the survey map and floor plan of the project on file." The recorded survey map filed simultaneously with the declaration shows 48 parking spaces. Of these 48 parking spaces, 35 are labeled as belonging to specific residential units, three are labeled with "A," "B," and "C," and 10 are labeled "Public Parking." The declaration and its incorporated survey map cannot be reasonably read to support Cooper Leasing's position that the declaration was intended to reserve 18 parking spots as the limited common area of the two commercial units — there are simply not 18 spaces available.

Cooper Leasing's extrinsic evidence cannot overcome this hard fact. One piece of evidence Cooper Leasing relies on is a municipal parking ordinance in effect

---

[29] AS 34.07.020(5).

at the time the declaration was recorded. This ordinance established minimum off-street parking requirements for various uses, including residential and business use.[30] Cooper Leasing argues that, based on the square footage of the commercial units, 18 parking spots were required for commercial use.[31] But if the ordinance required this, the developers did not follow it. They did not create enough parking spots to satisfy the number of spaces that would be required based on the square footage of the commercial and residential units. According to the declaration, the simultaneously recorded survey map depicts the units' limited common areas — and it shows only 48 parking spots, not the 53 that Cooper Leasing argues were required by the municipal ordinance.[32] We cannot read the declaration to reserve parking spots that were never created.[33]

---

[30]     *See* former AMC 21.45.080 (1978).

[31]     *See* former AMC 21.45.080(A) (1978) ("[T]he parking space requirements set forth in this section shall be provided and satisfactorily maintained for each use listed in this section."); former AMC 21.45.080(R) (1978) ("In the case of mixed uses, the total requirement for off-street parking facilities shall be the sum of the requirements for the various uses computed separately.").

[32]     Cooper Leasing calculates the required number of parking spots by adding one spot per residential unit (35) and one spot per 300 sq. ft. of commercial space (18). An expert witness stated this was the requirement in 1977 during the construction of the Building. But Cooper Leasing provides and cites the ordinance as re-written in 1978 to increase the number of spaces required for residential units. *See* former AMC 21.45.080(B) (1978) (requiring 1.25 spaces per "efficiency unit," 1.5 spaces per "1-bedroom unit" and "2-bedroom unit – 800 Sq. Ft. or less,"1.75 spaces per "2-bedroom unit – over 800 Sq. Ft." and "3-bedroom unit – 900 Sq. Ft. or less," and 2.5 spaces per "3-bedroom unit – over 900 Sq. Ft.").

The witness calculated a requirement of 53 parking spaces prior to the 1978 Ordinance and 79 spaces after it. The 48 spaces identified on the recorded survey map does not comply with either version of the ordinance.

[33]     Cooper Leasing argues that the superior court erred by relying on the testimony of a municipal official to interpret the meaning of the parking ordinance. "[I]t

Another piece of evidence Cooper Leasing relies on fails for similar reasons. Cooper Leasing points to a "site plan" prepared in 1977 that depicts 53 parking spots and cites the municipal parking ordinance requiring 18 spaces for commercial units. It suggests that this document depicts the limited common areas described in the declaration. But this document was not recorded simultaneously with the declaration and therefore is not the authoritative description of limited common areas "set forth on the survey map and/or the set of floor plans filed simultaneously herewith" and "described in Exhibit B."[34] The 1977 site plan showing 53 parking spots was not recorded until 2018, as part of an effort by the Association to qualify members for federal grant funds. Like the municipal parking ordinance, the 1977 site plan does not support reading the declaration to reserve for the commercial units 18 parking spots when there were simply not that many spots available.

> **2.  The superior court did not clearly err by finding that the declaration was not intended to reserve 10 parking spots for exclusive use of the commercial units.**

Cooper Leasing's argument that the 10 parking spaces labeled "Public Parking" in the declaration were intended for the exclusive use of its two commercial

---

is well established that expert witnesses are not permitted to testify on what the law is." *McGlinchy v. State, Dep't of Nat. Res.*, 354 P.3d 1025, 1036 (Alaska 2015). The official's testimony — that the Municipality of Anchorage was concerned only with the number of spots in a development, not how they were allocated — could be interpreted as testimony about municipal enforcement policy, not strictly the meaning of the statute. Because the declaration cannot be reasonably interpreted to reserve the parking spaces that Cooper Leasing argues were required by the ordinance, any error on this point was harmless.

[34]    *See* AS 34.07.030 ("There shall be filed and recorded simultaneously with the recording of the declaration in the recording district in which the property is located . . . a survey map of the surface of the land . . . [and] a set of the floor plans of the building . . . bearing the verified statement of a registered architect or registered professional engineer certifying that it is an accurate copy of portions of the plans of the building as filed with and approved by the governmental entity having jurisdiction . . . .").

units is more persuasive. That is a plausible interpretation of the declaration in light of its text, purpose, and extrinsic evidence. But it is also plausible to interpret the declaration as creating these parking spots for the broader public, and not for the exclusive use of the commercial units. Because the declaration is ambiguous on this point, it was up to the superior court to decide, as a factual matter, what the reasonable expectations underlying the declaration really were.[35] We cannot say the superior court's ultimate finding was clearly erroneous.

We begin with the language of the declaration, which according to the HPRA must describe any limited common areas of the condominium and specify to which unit or units each limited common element is allocated.[36] The declaration defines "[c]ommercial unit" as "Units 101 and 102 and their corresponding limited common areas." The definition for "[l]imited common areas" provides in part that "[t]he limited common areas for each unit are described in Exhibit B." As described above, Exhibit B lists the "portions of the common areas . . . reserved for the exclusive use of the particular units below listed," but does not list any limited common areas for the commercial units. This absence tends to support the Association's position that the commercial units were not reserved any limited common area parking.

We look next to the survey map, which according to the declaration and Exhibit B depicts units' limited common areas. The survey map depicts 35 parking spots labeled with the number of a residential unit (e.g., "202," "303," etc.). There is no similar label tying any parking spot to the commercial units. This too supports the

---

[35]     *Cf. Zamarallo v. Reges*, 321 P.3d 387, 394 (Alaska 2014) ("Interpretation becomes a task for the trier of fact when the parties present extrinsic evidence to clarify a contract's meaning, when this evidence points towards conflicting interpretations of the contract, and when the contract itself is reasonably susceptible of either meaning.").

[36]     AS 34.07.020(5); *see also* AS 34.07.160(b).

Association's position because under the HPRA the declaration must "stat[e] to which apartment" the use of any limited common areas "is reserved."[37]

The survey map depicts 10 "Public Parking" spots. Cooper Leasing argues that "public" parking means "commercial" parking, but the terms are not perfectly synonymous. Parking for the "public" could include not only those associated with commercial units, but also guests of residential unit owners.[38] Moreover, the survey map depicts one storage area as "Commercial Storage," which suggests that the term "public" was intended to mean something different than "commercial." This too supports the Association's argument.

Cooper Leasing argues that it would be absurd to create a building with commercial tenants without any dedicated parking for those businesses. There is some force to that argument. Each residential unit is granted an exclusive parking space, and failing to create any exclusive parking for the commercial units could greatly undermine their utility and marketability. But creating parking open to the "public" (as opposed to only guests of the commercial tenants) does not completely frustrate the purpose of having commercial units in the Building because customers and employees can still use that parking. Therefore it is not absurd to interpret the declaration as creating no exclusive parking for the commercial units.

Nevertheless, there is ambiguity in the declaration and attached documents. The declaration defines the commercial units to include their "corresponding limited common areas," suggesting that these units were intended to have limited common areas. This interpretation has some support in the floor plan of the basement depicting a space for "Commercial Storage," which could reasonably be interpreted as intended to create a limited common area of the commercial units.

_____

[37]     AS 34.07.020(5).

[38]     *See, e.g.*, *Public*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Open or available for all to use, share, or enjoy.").

Moreover, the Association conceded at various points in the litigation that this storage area *was* the limited common area of the commercial units. That concession weakens some of the inferences described above. For example, Exhibit B's list of limited common areas does not include the commercial storage area, and there is no label on the floor plan assigning it to the commercial units. If the declaration was nevertheless intended to create limited common area storage for the commercial units, perhaps it was intended to also create limited common area parking for these units despite the lack of express mention. And perhaps the declaration's imprecise treatment of limited common area storage supports reading "Public Parking" as an imprecise description of limited common area commercial parking.

This brings us to the parties' conduct. The record reveals that there were at least two attempts to amend the declaration to specifically assign the disputed spaces to the commercial units. However, no amendments were ever recorded. These attempts tend to suggest that the original declaration did not grant the commercial units exclusive parking, as there would be no need to amend the declaration if it did. Alternatively, these attempts could be viewed as an attempt to resolve the ambiguity in the documents, and any uncertainty about what they meant, through a more collaborative approach than litigation.

The parties also point to the "House Rules," which granted the commercial units exclusive use of the 10 south-side parking spaces between the hours of 8:00 a.m. and 6:00 p.m. Like the attempts at amending the declaration, these rules can support different inferences. On the one hand, the rules could support the inference that the commercial units' right to exclusive use of these parking spots had always been recognized, and allowing visitors to use the spots after business hours was merely an act of generosity by Cooper Leasing. On the other hand, the rules could support the inference that it was understood the spots were intended for the broader public, and granting the commercial units exclusive use during business hours was an attempt to divvy up public use in a way that made most sense for all tenants.

Finally, there is evidence pertaining to the 1977 site plan described above. In 2018 the Association issued a resolution to "adopt" and record the 1977 site plan "as the site plan of the association," as part of an effort to unlock federal grant funds. The resolution states (incorrectly) that "the site plan agrees with the recorded plat" and does not attempt to reconcile the two documents. Cooper Leasing also submitted an unsigned draft letter from the Association, dated in 2018 and addressed to the Alaska Housing Finance Corporation, stating that 18 of the 19 unassigned parking spaces depicted on the 1977 site plan were "allocated" to Cooper Leasing. But at trial the person who drafted the letter testified that she did not believe that Cooper Leasing owned these spaces, that she never sent the letter, and that she only meant to convey that the site plan verified that there was sufficient parking to comply with applicable municipal codes. This evidence does not offer much support for either party's position.

The superior court was faced with two plausible interpretations of the declaration in light of the extrinsic evidence presented. When a contract is susceptible of two plausible interpretations in light of its text and relevant extrinsic evidence, the underlying intent becomes a factual question for the superior court.[39] The court ultimately found that the declaration's use of the term "public parking," combined with the limited scope of the "House Rules" and the incomplete history of attempts to amend the declaration, supported the conclusion that the declaration was not intended to create limited common area parking for the commercial units. Because this conclusion is not clearly erroneous in light of the declaration's language and extrinsic evidence described above, we affirm the superior court's ruling.

---

[39]     *Zamarello*, 321 P.3d at 394.

**3.    The superior court did not err by refusing to estop the Association from denying Cooper Leasing's right to exclusive parking.**

Cooper Leasing argues that the superior court should have awarded it 10 parking spaces under the doctrines of equitable estoppel and quasi-estoppel. It maintains that for decades the Association took the position that Cooper Leasing had exclusive use of the 10 south-side parking spots and now should be estopped from taking a contrary position. But the factual predicate of Cooper Leasing's argument is mistaken.

Equitable estoppel and quasi-estoppel are common law doctrines that a court may apply to bar a party from taking a position inconsistent with a previous position. "The general elements of equitable estoppel are (1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice."[40] Quasi-estoppel is a doctrine that "preclud[es] a party from taking a position so inconsistent with one he has previously taken that circumstances render assertion of the second position unconscionable."[41] Unlike equitable estoppel, quasi-estoppel does not require "ignorance or reliance as essential elements," but they are relevant to the inquiry.[42]

Cooper Leasing argues that: (1) "the Association took the position for thirty years that the commercial unit owners had the exclusive use of the south-side area identified as 'public parking' during the work week during business hours"; (2) Cooper

---

[40]    *Mun. of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984) (citing *Jamison v. Consol. Utils.*, 576 P.2d 97, 102 (Alaska 1978)).

[41]    *Rockstad v. Erikson*, 113 P.3d 1215, 1223 (Alaska 2005).

[42]    *Id.* (quoting *Jamison,* 576 P.2d at 102) ("Among the many factors we consider in applying quasi-estoppel are: (1) 'whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position'; (2) 'the magnitude of the inconsistency'; (3) 'whether changed circumstances tend to justify the inconsistency'; (4) whether the party claiming estoppel relied on the inconsistency to his detriment; and (5) 'whether the first assertion was made with full knowledge of the facts.' ").

Leasing relied on the Association's conduct by not "vigorously pursu[ing] a Declaration amendment"; and (3) Cooper Leasing was prejudiced because the passage of time has limited its ability to produce "evidence of the project's founders' original intent [for] the commercial unit owners' parking rights."

This argument rests on a factual predicate that the superior court did not accept. The court did not find that the Association asserted that Cooper Leasing had a legal right to exclusive use of the public parking spaces. Instead, the superior court found that the Association's "House Rules" gave Cooper Leasing the exclusive use of those spots *during business hours*. The "House Rules" were not tantamount to a concession that the commercial units *owned* the 10 parking spots labeled "Public Parking." Although it is true that the "House Rules" may have induced Cooper Leasing not to vigorously pursue its perceived rights in the declaration, they did not amount to the kind of position that would later estop the Association from disputing Cooper Leasing's exclusive right to the spots in question. We therefore affirm the superior court's ruling on this point.

## B. We Vacate And Remand The Superior Court's Storage Ruling.

The superior court applied the doctrine of quasi-estoppel to conclude that Cooper Leasing owned the northwest basement corner as a limited common area. The court found that Cooper Leasing and the Association had agreed, decades earlier, to swap the commercial storage space that was reserved for the commercial units for the general building storage space, which was a common area of the condominium. The court then ruled that the Association should be estopped from arguing that Cooper Leasing was not entitled to keep the storage space it had received in the swap.

The Association argues this ruling was error. It argues that the court clearly erred in finding that there was an agreement to swap storage spaces. It also argues that Cooper Leasing was not entitled to the benefit of quasi-estoppel because it did not act in good faith. We are not persuaded by either argument.

-23-                                                                      7700

However, we are persuaded by the Association's argument that the superior court incorrectly applied the test for quasi-estoppel to defeat the unit owners' properly recorded title to real property. In these circumstances a special showing must be made: the party claiming estoppel must show that the title holder of record knowingly accepted the benefit of the transaction.[43] The court did not make a finding on whether the title holders of record — the owners of the condominium units who stand to lose their interest in the disputed common area — knowingly accepted the benefits of the storage-area swap with Cooper Leasing. We therefore remand for further proceedings.

### 1. The superior court did not clearly err by finding that the Association and Cooper Leasing agreed to swap storage spaces.

The Association argues that it was clearly erroneous for the court to find an agreement to swap basement storage spaces. We disagree. Both the testimony of Jeff Cooper and the 1984 Association Minutes, which showed that Ron Cooper asked if there were any objections to trading the storage areas, support the superior court's finding that a voluntary swap of storage spaces occurred. And the Association's act of renting out the storage area for multiple years and making changes to the space supports the superior court's conclusion that the swap was intended to be "enforceable" (i.e., permanent).

The Association asserts that it should not be bound by the swap because Cooper Leasing effectively took over the space without its consent. But the superior court appears to have implicitly rejected this theory; instead it inferred that the agreement was voluntary. The Association fails to show that this finding is clearly erroneous.

---

[43] *See Dressel v. Weeks*, 779 P.2d 324, 332-33 (Alaska 1989).

## 2. The superior court did not clearly err in finding that Cooper Leasing acted in good faith.

The Association claims the superior court erred in finding that Cooper Leasing acted in good faith. The Association essentially argues that Ron Cooper knew that the commercial units were not entitled to use the basement storage area and used his position on the board to improperly gain control of the area anyway.

We have not mentioned good faith as one of the factors the court can consider when deciding whether to apply the doctrine of quasi-estoppel.[44] Because a claim of quasi-estoppel is an "appeal[] to the conscience of the court to prevent injustice,"[45] the argument that a party's bad faith precludes it from claiming quasi-estoppel has some force. But we need not decide whether to adopt that rule because the Association does not point to any explicit evidence of Cooper Leasing's bad faith.

The fact that Ron Cooper or his son Jeff Cooper were on the board for 19 of its first 32 years gives rise to the *potential* for bad faith self-dealing. A witness testified that "[Ron] Cooper had kind of the majority of everything, he sort of made up the rules." The lack of recordkeeping might be evidence of bad faith, yet it also might be evidence of innocent disorganization. The Association does not present explicit evidence of bad faith by Cooper Leasing, and the superior court's application of an equitable doctrine rooted in "the conscience of the court" indicates that it implicitly found the Coopers did not lack good faith.[46] Due to the lack of evidence of bad faith dealings, this finding is not clearly erroneous.

---

[44] *See Rockstad*, 113 P.3d at 1223.

[45] *Alaska Interstate Constr., LLC v. Pac. Diversified Invs., Inc.*, 279 P.3d 1156, 1180 (Alaska 2012) (quoting *Rockstad*, 113 P.3d at 1223).

[46] *Id.* at 180.

**3.     It was error to apply quasi-estoppel to defeat record title without determining whether the condominium unit owners knowingly accepted the benefit of the storage space swap.**

Under the HPRA, unit owners' interests in common areas are described in the declaration, and the declaration must be recorded.[47]  Any change to unit owners' interest in their property, including in common areas like the Building's general storage area, must be made through an amendment to the declaration, which must also be recorded.[48]  The superior court acknowledged these rules, but nevertheless held that the doctrine of quasi-estoppel could override them.  But the superior court did not apply the correct rule of law on this point.  Quasi-estoppel cannot be applied to defeat unit owners' recorded interest in common areas unless "the record owner . . . elected, ratified, acquiesced in and/or accepted the benefits of the transaction at issue."[49]

We adopted this test in *Dressel v. Weeks*.[50]  In that case an unscrupulous owner entered into an agreement to trade his cabin for a house.[51]  The other party to the trade did not record the transaction and then sold the cabin to a third party.[52]  When the third party claimed ownership of the cabin, the unscrupulous owner asserted his recorded title to the cabin as a defense.[53]  The third party argued that the unscrupulous owner should be estopped from denying the transfer.[54]

We held that "the doctrine of quasi estoppel may be applied to divest legal title to real property from the title holder of record where the title holder knowingly

---

[47]     AS 34.07.020(4); AS 34.07.010(b).

[48]     AS 34.07.010(b); *see also* AS 34.07.025.

[49]     *Dressel v. Weeks*, 779 P.2d 324, 332 (Alaska 1989).

[50]     *Id.*

[51]     *Id.* at 326-27.

[52]     *Id.* at 326.

[53]     *Id.* at 327.

[54]     *Id.* at 329.

benefitted from a transaction involving the property which runs counter to the interest sought to be asserted."[55] Requiring that the title owner personally and knowingly accept the benefit of the transaction addressed the "concern that the recording act not be too easily avoided."[56] The title holder's acceptance or acquiescence in the benefit must be knowing: "[o]rdinarily, no estoppel arises from the mere acceptance of benefits by a person in the absence of full knowledge of the facts and of his rights."[57]

We illustrated how this test applies when there are multiple title holders to property, with different involvement in the disputed transaction, in *Rockstad v. Erikson*.[58] In that case a man who owned a house with his wife as tenants by the entirety signed a deed of trust for the house, but his wife did not sign this deed.[59] He then denied the validity of the deed because both tenants' signatures are required for a deed conveying property owned by tenants by the entirety.[60] Applying quasi-estoppel, we determined that the deed was valid against the *man's one-half interest* because the man had no explanation for his inconsistent positions; but the wife, who did not participate in the transaction, retained her interest.[61] This outcome shows how the *Dressel* test protects the interest of innocent property owners when the property is owned in common.

Applying this test in the context of a condominium dispute means applying it to the unit owners, not the condominium association. In this case the "title

---

[55] *Id.* at 333; *see also id.* at 332 ("For quasi-estoppel to preclude the assertion of record title, the record owner must have elected, ratified, acquiesced in and/or accepted the benefits of the transaction at issue.").

[56] *Id.* at 332.

[57] *Id.* at 332 n.11 (quoting 28 AM. JUR. 2D *Estoppel and Waiver* § 60 (1966)).

[58] 113 P.3d 1215, 1222-23 (Alaska 2005).

[59] *Id.* at 1218.

[60] *Id.* at 1223.

[61] *Id.*

holder of record," for purposes of the *Dressel* test, is not the Association.[62] The HPRA provides that "[e]ach apartment owner has the common right to a share, with other apartment owners, in the common areas and facilities."[63] And "[e]ach apartment owner is entitled to an undivided interest in the common areas and facilities in the percentage expressed in the declaration."[64] The declaration in the instant case reaffirms that unit owners possess a "separate fee-hold estate" in their unit and "own[] in common" "an undivided fee ownership interest in the common areas."

Not only do the unit owners have a property interest in the common areas, but this interest is also protected by statute. The HPRA states that "common areas and facilities shall remain undivided" and forbids "partition or division of any part" of common areas.[65] "The percentage of the undivided interest of each apartment owner in the common areas and facilities as expressed in the declaration may not be altered except in accordance with procedures set out in the bylaws and *by amending the declaration*."[66]

The Association holds no ownership interest in any property; it merely maintains the common areas.[67] The general storage area is a common area owned by all unit owners. When the Association traded the general storage area for the

---

[62]  *See Dressel*, 779 P.2d at 333.

[63]  AS 34.07.160(a).

[64]  AS 34.07.160(b).

[65]  AS 34.07.190(a).

[66]  AS 34.07.180(a) (emphasis added); *see also* AS 34.07.100 ("The percentage of the undivided interest in the common areas and facilities may not be separated from the apartment to which it appertains even though the interest is not expressly mentioned or described in the conveyance or other instrument.").

[67]  According to the declaration, "[t]he Association shall maintain, repair and make necessary improvements to, and pay for out of the maintenance fund to be provided, all common areas and the building thereon."

commercial storage area owned by Cooper Leasing, the Association traded property it did not own. When the superior court estopped the Association from denying that the swap of storage areas was enforceable, the court effectively altered individual unit owners' interest in this common area. For this to be an appropriate application of quasi-estoppel, the court had to determine whether the unit owners knowingly benefitted from the exchange of their common area storage space — the Association's benefit and knowledge is not sufficient.[68]

In this case the superior court focused its quasi-estoppel analysis on the conduct of the Association. But the Association is not the title owner of the common area; it is not the entity whose ownership interest is diminished or altered by applying quasi-estoppel. Moreover, the fact that the Association received benefits from the transaction does not necessarily mean that all of the condominium owners whose rights are affected knowingly did so. We therefore remand for the court to consider whether the unit owners themselves knowingly "elected, ratified, acquiesced in and/or accepted the benefits of the transaction at issue."[69]

This test is difficult to meet in the context of a condominium. There are numerous unit owners, each of whom has an interest in the storage area. Showing that each of these owners knowingly accepted the benefits of the storage space swap is a tall order. But that is as it should be. Although quasi-estoppel can overcome record title, it is an equitable doctrine, so it must be applied in equitable ways. In *Dressel* we affirmed the sound policy of "foster[ing] reliance on record title," which "provides certainty to landowners and purchasers."[70] It would be inequitable to allow the actions

---

[68]    The Association's conduct of swapping the storage areas cannot be equated to an amendment of the declaration, even in practical terms. Amending the declaration requires approval of 75% of the condominium's voting power. But a simple majority of owners can control the Association.

[69]    *Dressel v. Weeks*, 779 P.2d 324, 332 (Alaska 1989).

[70]    *Id.*

of a condominium association acting beyond its authority to bind innocent condominium owners, who may have relied on the recorded documents when making their purchase.

Cooper Leasing does not squarely address this argument, but raises three related objections. First, Cooper Leasing argues that the "swap" was an exercise of the Association's statutory powers to "regulate the use, maintenance, repair, replacement, and modification of common elements."[71] The statute cited for this power is not a part of the HPRA and is inapplicable to this dispute;[72] but Cooper Leasing also misreads this statutory power. "[R]egulat[ing] the use, maintenance, repair, replacement, and modification of common elements" means that a condominium association may control how the common areas are used, repaired, or physically modified, not that the association may modify the metes and bounds of the common areas.[73] Further, Cooper Leasing's reading of AS 34.08.320(a)(6) conflicts with AS 34.08.160(c), which requires that any transfer of common area into limited common area be directly approved by owners and recorded in the declaration.

Second, Cooper Leasing argues that the swap did not violate the HPRA because the two basement storage spaces are functionally identical. Alaska Statute 34.07.180(a), which *is* part of the HPRA, prohibits the alteration of each unit owner's undivided interest in "in the common areas and facilities . . . except in accordance with . . . the bylaws and by amending the declaration." Cooper Leasing argues that the similar square footage of the storage areas means that swap did not alter each unit's undivided share of common spaces. But although the storage areas are very close in

---

[71]     AS 34.08.320(a)(6).

[72]     Alaska Statute 34.08.320 is a part of the Uniform Common Interest Ownership Act (Ch. 95, SLA 1985), which only applies to condominiums created after January 1, 1986. AS 34.08.010.

[73]     AS 34.08.320(a)(6).

size, they do not have exactly the same square footage.[74]  And in any event, common areas with the same square footage may be very different in other respects.  A north-facing terrace may be much less desirable than a south-facing terrace of the same size.  Swapping a common area in a secluded location for a common area next to a busy street would also significantly change tenants' property rights, even if the common areas were the same size.  In this case, the "Commercial Storage" area is harder to secure because the stairway and electrical room access are within this area.

More importantly, under the HPRA, unit owners' undivided interest in the common areas described in the declaration cannot be altered without amending the declaration.[75]  The cases we have found addressing this issue have generally held that any conversion of a common area to a limited common area "is sufficient to change the relative interest of the unit owners in that common area."[76]  Therefore the Association had no authority to permanently swap the storage spaces.

Third, Cooper Leasing argues that the Association should be estopped from asserting that the unit owners — and not the Association — are the true title holders of the storage space.  Cooper Leasing points to instances in which the Association and its attorneys stated that the Association owned the storage space.  This is an overly technical interpretation of the Association's statements.  Although the Association does not technically own the storage space, in several respects it acts on behalf of the unit owners who do own it.  Additionally, there is no dispute about who

---

[74]     Cooper Leasing received an extra three square feet.

[75]     AS 34.07.180(a) ("The percentage of the undivided interest of each apartment owner in the common areas and facilities as expressed in the declaration may not be altered except in accordance with procedures set out in the bylaws and by amending the declaration.").

[76]     *See Kaplan v. Boudreaux*, 573 N.E.2d 495, 500 (Mass. 1991); *see also Ridgely Condo. Ass'n v. Smyrnioudis*, 681 A.2d 494, 499-501 (Md. App. 1996) (agreeing with *Kaplan* and collecting additional cases).

owns the common area. The declaration and governing statutes are clear that the Association does not own any common areas.[77] Any imprecision in the Association's statements is not a basis for estoppel.

Because the superior court did not apply the test articulated in *Dressel* and *Rockstad* to determine when quasi-estoppel may be used to defeat record title, we vacate and remand for further proceedings.

### 4. The superior court's ruling on storage cannot be affirmed on the ground of quasi-contract.

Cooper Leasing argues that we should affirm on the alternative grounds of quasi-contract. But the criteria for a quasi-contract are not met. "[T]he most significant requirement for recovery in quasi-contract is that the enrichment to the defendant must be unjust; that is, the defendant must receive a true windfall or 'something for nothing.' "[78] When a party has given "fair consideration or value" in exchange for the benefits conferred, "there is no windfall and no recovery will lie."[79] Here, the swap of the storage spaces provided "fair consideration or value" — each party received the benefit of one storage space at the cost of giving up the other. Because the storage space swap did not entail "something for nothing," the doctrine of quasi-contract does not apply.[80]

## V. CONCLUSION

---

[77] *See* AS 34.07.160(b); *cf.* AS 34.08.430(d). On appeal, in describing the facts of the case, the Association acknowledged that it had no ownership interest.

[78] *Alaska Sales & Serv., Inc., v. Millet*, 735 P.2d 743, 746 (Alaska 1987) (citation omitted).

[79] *Id.*

[80] The Association appealed the superior court's ruling that neither party prevailed in the litigation, so neither party is entitled to an award of attorney's fees. Because we vacate and remand the superior court's ruling on storage, we vacate and remand its ruling on attorney's fees as well.

We AFFIRM the superior court's ruling on parking, VACATE the superior court's ruling as to the basement storage areas, and REMAND for further proceedings regarding the storage areas.

**7700**